# BURLINGTON NORTHERN RAILROAD COMPANY and KANSAS CITY SOUTHERN RAILWAY COMPANY *v.* Charles D. RAGLAND, Commissioner of Revenues of the Department of Finance and Administration of the State of Arkansas

83-48                                                655 S.W.2d 437

## Supreme Court of Arkansas
## Opinion delivered July 18, 1983

*Warner & Smith; Hardin, Jesson & Dawson;* and *Rowland & Templeton,* for appellants.

*Timothy J. Leathers, Joseph V. Svoboda, Kelly S. Jennings, Wayne Zakrzewski, John H. Theis, Ann Fuchs,* and *Michael D. Munns,* by: *Joe Morphew,* for appellee.

STEELE HAYS, Justice. This case involves the attempted imposition of a use tax by the State of Arkansas on eighty-six railroad freight cars newly acquired by lease or purchase by the Burlington Northern and Kansas City Southern Railway Companies, and loaded for the first time in Arkansas with cargo destined for delivery outside the state. The court below found the tax valid and appellants challenge that holding as

a violation of the commerce clause of the United States Constitution. On appeal, we reverse.

The Arkansas Compensating Tax Act of 1949 was enacted to compensate for sales taxes lost on out-of-state purchases of articles to be used or consumed in Arkansas. It imposes an equivalent three percent tax on the purchase price of such articles. The taxing authorization is found in Ark. Stat. Ann. § 84-3105 (a):

> "There is hereby levied and there shall be collected from every person in this State a tax or excise for the privilege of storing, using or consuming, within the State, any article of tangible personal property, after the passage and approval of this Act [§§ 84-3105 — 84-3128], purchased for storage, use or consumption in this State at the rate of three per centum (3%) of the sales price of such.property. This tax will not apply with respect to the storage, use or consumption of any article of tangible personal property purchased, produced or manufactured outside this State until the transportation of such article has finally come to rest within this State or until such article has become commingled with the general mass of property of this State. This tax shall apply to the use, storage or consumption of every article of tangible personal property, except as hereinafter provided, irrespective of whether the article or similar articles are manufactured within the State of Arkansas or are available for purchase within the State of Arkansas, and irrespective of any other condition. . . . "

Appellants were audited by the Arkansas Commissioner of Revenues and a use tax was imposed on the eighty-six freight cars. Appellants paid the tax under protest and after administrative procedures were concluded, each railroad company filed separate taxpayer suits under Ark. Stat. Ann. § 84-4721 (Repl. 1980). Because of the similarity of the disputes, it was agreed that the suits would be consolidated. The facts were stipulated. As to Burlington, the state assessed a tax on fifty-six railroad cars. At the time of the assessment, the executive offices were in St. Louis, Missouri

and principal operating offices in Springfield. Railroad facilities were operated and maintained in Arkansas as well as in eight other states. Of the fifty-six cars, it was stipulated that two cars were characteristic of the movement of all fifty-six. The first car arrived in Jonesboro, Arkansas on July 7, 1977 to be delivered to the Cotton Belt Railroad for loading. On July 13, the car was moved to Memphis. On August 14, 1977, the car returned to Jonesboro. It was loaded and left Jonesboro on August 23. The movement of the second car was similar except its stops in Arkansas were longer by several days. In all instances the cars were unloaded at destinations outside of Arkansas.

As to Kansas City Southern, the assessed tax was imposed on thirty boxcars. KCS operates in six states including Arkansas, with thirteen percent of its trackage in Arkansas. It was stipulated that three cars were representative of the movement of all thirty cars. KCS, however, states simply that the cars were delivered to Ashdown for loading, spent only a short time in Arkansas and the movement of the cars reflects that all the cars spent only brief and isolated periods of time within the state since leaving Ashdown. That is all we know of the length or purpose of their stay in Arkansas.

In urging that the Arkansas use tax is not applicable to these facts, appellants rely largely on cases decided prior to 1977, which turned on whether interstate commerce was involved; if so, the imposition of a state tax was generally held invalid. But if the property had ceased to be in the stream of interstate commerce and had become a part of the common mass of property within a state, then a "taxable moment" had occurred and state taxation would be upheld. See *Southern Pacific Co.* v. *Gallagher*, 306 U.S. 167, 59 S.Ct. 389 (1939); *Henneford* v. *Silas Mason Co.*, 300 U.S. 577, 57 S.Ct. 524 (1937).

But in 1977 there was an abrupt change of course. The case of *Complete Auto Transit* v. *Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977) was decided, and a wholly different approach to state taxing jurisdiction resulted. In *Brady*, the Supreme Court expressly overruled the much

maligned *Spector Motor Service* v. *O'Connor,* 340 U.S. 602, 71 S.Ct. 508 (1951), the leading case limiting state taxation on the privilege of doing business in a state, as a violation of the commerce clause. The court abandoned, as formalistic and impractical, prior standards applicable to challenges to state taxation on interstate commerce and laid down new guidelines for making an appropriate evaluation. In cases decided since *Brady,* it is clear whenever there is a challenge to any state tax on interstate commerce, the tax will be subjected to the *Brady* test. It has also become clear that the test will be applied to a broader spectrum of commerce, and the older concepts of "purely local activities," "goods not yet in the stream of commerce," "taxable moments" etc., are no longer relevant criteria in determining whether or not an activity is within interstate commerce and, therefore, subject to the *Brady* test. If the tax may substantially affect interstate commerce, then it is subject to commerce clause scrutiny under *Brady.* See specifically *Commonwealth Edison* v. *State of Montana,* 453 U.S. 609 (1981), (severance tax); see also *Mobil Oil Corp.* v. *Comm'r of Taxes of Vermont,* 445 U.S. 425 (1980), (income tax); *Japan Line Ltd.* v. *Co. of Los Angeles,* 441 U.S. 434 (1979), (ad valorem property tax); *Dept. of Rev. of State of Washington* v. *Stevedoring Co.,* 435 U.S. 734 (1978), (business and occupation tax); *National Geographic Society* v. *California Bd. of Equalization,* 430 U.S. 551 (1977), (use tax); *Brady, supra,* (sales tax).

The procedure set out in *Brady* emphasizes the importance of looking at the practical effects of the taxation and moves away from labels and a form-over-substance approach. The *Brady* test permits taxation on interstate commerce if it meets four requirements: 1) the activity has a substantial nexus with the state; 2) the tax is fairly apportioned; 3) the tax does not discriminate against interstate commerce; 4) the tax is fairly related to the services provided by the state.

Appellants argue that the substantial nexus requirement is lacking, in this instance, but we need not settle that in this case. For one thing, if the issue were simply whether the first loading of new boxcars in Arkansas provides a substantial nexus, it might not be difficult to agree with

appellants. But we are unwilling to provide what might be construed as precedent under *Brady* that new railroad cars are beyond our use tax jurisdiction when they enter the system on trackage in Arkansas, irrespective of where the initial loading occurs, assuming, of course, that all four prongs of the *Brady* test are satisfied. For another, a review of the Supreme Court decisions following *Brady*, of the treatment of those decisions in other jurisdictions, and of numerous analyses of these cases, makes it apparent that what constitutes substantial nexus has not been clearly established.[1] In *National Geographic, supra,* decided soon after *Brady*, a use tax was upheld on a foreign corporation vendor which had magazine subscriptions sent to California residents. The only in-state activity in California was two advertising offices of National Geographic which had no relationship to the business being carried on by this District of Columbia corporation. The court found this nexus sufficient to satisfy *Brady*. The court said the relevant question was not whether the use tax related to the seller's activities carried on within the state, but,

> . . . Simply whether the facts demonstrate some definite link, some minimum connection between the state and the person it seeks to tax.

In *Commonwealth Edison* v. *Montana, supra,* the court gave further elaboration to the meaning of the nexus requirement. There, a severance tax on coal mining was being imposed by Montana and the taxpayers were challenging its validity under the fourth prong of the *Brady* test —arguing that the amount collected was not fairly related to the additional costs the states incurred because of coal mining. The court rejected the argument:

> . . . There is no requirement under the Due Process Clause that the amount of general revenue taxes

---

[1]See, *State Taxation on the Privilege of Doing Interstate Business,* 1978 Boston College Law Review 312; *State Use Taxes After National Geographic Society v. Cal. Bd. of Equal.,* 64 Virginia Law Review 145 (1978); *Recent Developments in State Taxation of Interstate Commerce,* 7 Capital Law Review 143 (1977); *State Taxation of Interstate Commerce,* 91 Harvard Law Review 72 (1977).

collected from a particular activity must be particularly related to the value of the services of the activity . . . The only benefit to which the taxpayer is entitled is that derived from his enjoyment of the privileges of living in an organized society . . . any other view would preclude the levying of taxes except as they are used to compensate for the burden of those who pay them and would involve abandonment of the most fundamental principle of government — that it exists primarily to provide for the common good . . .

. . . It was not the purpose of the commerce clause to relieve those engaged in interstate commerce from their just share of the tax burden even though it increases the cost of doing business . . . The just share of state tax burden includes sharing in the cost of providing police and fire protection, the benefit of a trained work force and the advantages of a civilized society. . . . *Montana* at 622-624.

The court went on to say that the first and fourth prongs of the *Brady* test were closely related. Once the first requirement is met, the fourth prong requires only that the measure of the tax be reasonably related to the extent of the contact. Quoting from *Wisconsin* v. *J. C. Penney*, 311 U.S. 435 (1940), the court concluded:

. . . The incidence of the tax as well as its measure must be tied to the earnings which the state had made possible insofar as government is the prerequisite for the fruits of civilization.

Finding that the tax was measured as a percentage of the coal taken, the court held the tax was in proper proportion to the taxpayers' activities within the state and their consequent enjoyment of the opportunities and protections the state had afforded.

Appellants argue that the boxcars had not "finally come to rest within this state," that none of the boxcars are to be used exclusively in Arkansas, but will be used throughout the railway systems of both companies and doubtless even

beyond those on frequent occasion, given the easy interchange of railway freight cars among American railroads.

The Commissioner counters with the argument that an article may finally come to rest without a concommitant requirement that the property remain permanently at rest within the state. He relies on *Skelton* v. *Federal Express Corp.*, 259 Ark. 127, 531 S.W.2d 941, decided in January, 1976, where we reversed a holding by the trial court that eighteen unfinished Falcon jets transported from points outside of Arkansas and the United States to Memphis, Tennessee, had not finally come to rest in Arkansas because of stopovers at Little Rock, lasting up to fifty days, for necessary modifications to the body and structure of the aircraft. The Chancellor held the use tax assessment was unlawful and, relying on *Calvert* v. *Zanes-Ewalt Warehouse, Inc.*, 502 S.W.2d 689 (Tex. 1973), we reversed, though not without a division within the court. But the Arkansas legislature promptly repudiated that interpretation as wholly unintended by the Arkansas Compensating Tax Act (Act 487 of 1949), with the passage of Act 1237 of 1976, approved with an emergency clause on February 16, 1976, stating:

> The General Assembly hereby determines that it was not the intent of Act 487 of 1949 . . . to impose the compensating use tax upon aircraft . . . and railroad parts, cars and equipment . . . and any claim the State of Arkansas now has for collection of compensating use taxes upon any such [property] brought into Arkansas solely and exclusively for refurbishing, conversion or modification, shall not be collected . . .

We come to the conclusion that our use tax statute as drafted was not intended to apply in the situation here presented, the isolated act of loading a boxcar in Arkansas with cargo consigned to points outside the state, a taxing concept built on the fact that such is a first use of the boxcar. Nothing about initial loading suggests the boxcar has finally come to rest, quite the opposite. Furthermore, it is clear that the state of the law applicable to state taxing jurisdiction in force at the time (1949) was such that only by

carefully *restricting* its attempts at imposing a tax on interstate transactions, could Arkansas avoid running afoul of the commerce clause. Thus, we believe the compensating tax act was not intended to reach as far as appellee would have us go, and apply simply to the first use of new railroad boxcars designed for usage throughout an interstate system.

Granted, all of that was changed by *Complete Auto Transit* v. *Brady, supra,* but our statute is not self-effectuating simply because of *Brady.* What we have said here is not to be construed as holding that Arkansas could not lawfully impose a fairly apportioned use tax on newly acquired railroad equipment to be used regularly over its lifetime in systems which include Arkansas, provided the *Brady* criteria are met.

The decree is reversed.