Robert S. CALVERT et al., Petitioners,

v.

ZANES–EWALT WAREHOUSE, INC.,
Respondent.

No. B–4010.

Supreme Court of Texas.

Dec. 12, 1973.

Rehearing Denied Jan. 9, 1974.

John L. Hill, Atty. Gen., Lewis A. Jones, Asst. Atty. Gen., Austin, for petitioners.

Bowyer, Thomas & Sweet, H. T. Bowyer, and William W. Sweet, Dallas, for respondent.

STEAKLEY, Justice.

This is a suit by Zanes-Ewalt Warehouse, Inc. to recover cigarette taxes in the amount of $27,501.65 paid to the State of Texas under protest. The judgments below were for recovery of the taxes, Calvert v. Zanes-Ewalt Warehouse, Inc., Tex.Civ.App., 492 S.W.2d 638. The Comptroller of Public Accounts of the State of Texas is petitioner here.

In the statutory cigarette tax regulations, Zanes-Ewalt is a "distributing agent", having sought and obtained an annually renewable permit from the State as such. The permit is required of those "engaged in the business of storing unstamped cigarettes previously sold in interstate commerce and received in interstate commerce for distribution or delivery only upon order received from without the State . . . ."[1] The "distributing agent" is not required to obtain or affix the stamps which evidence payment of the State tax on cigarettes,[2] this being the primary responsibility of the statutory "distributor."[3]

Under review here are these provisions of the Cigarette Tax Law to which

---

1. Tex.Tax.-Gen.Ann. art. 7.23, V.A.T.S. (1967)

2. Tex.Tax.-Gen.Ann. arts. 7.10 (1967), 7.11 (1959)

3. "Distributor" shall mean and include every person in this State who manufactures or produces cigarettes or who ships, transports, or imports into this State or in any manner acquires or possesses cigarettes and makes a "first sale" of the same in this State; and said term shall also include every person in this State who is authorized to purchase an open account unstamped cigarettes direct from all those manufacturers who have general distribution of cigarettes in Texas and who sell to qualified wholesalers or in any manner acquires or possesses unstamped cigarettes for the purpose of making a "first sale" of the same within this State. Tex. Tax.-Gen.Ann. art. 7.01(13) (1969)

Zanes-Ewalt became subject as a licensed distributing agent:

"(1) A tax of Two Dollars ($2) per thousand on cigarettes weighing not more than three (3) pounds per thousand and Four Dollars and Ten Cents ($4.10) per thousand on those weighing more than three (3) pounds per thousand is hereby imposed on all cigarettes used or otherwise disposed of in this State for any purpose whatsoever. The said tax shall be paid only once by the person making the 'first sale' in this State and shall become due and payable as soon as such cigarettes are subject to a first sale in Texas, it being intended to impose the tax as soon as such cigarettes are received by any person in Texas for the purpose of making a 'first sale' of same.[4]

" 'First Sale' shall mean and include . . . the loss of cigarettes in this State whether by negligence, theft, or any other unaccountable loss."[5]

The taxes in question were exacted by the Comptroller when an audit of the accounts of Zanes-Ewalt covering the period from October 1, 1969 through November 30, 1970 revealed a shortage of 3,548,600 cigarettes which Zanes-Ewalt had received from out-of-state distributing companies and upon which the State cigarette tax had not been paid. The cigarettes having been lost in this State, the Comptroller exacted the tax as a "first sale" as required by the provisions of the Cigarette Tax Law, above noted.

The questions for decision are whether, as to Zanes-Ewalt, the tax thus imposed is an impermissible tax on interstate commerce and whether the statutory manner of its imposition offends constitutional requirements of reasonableness and due process. We answer each question in the negative, and thus sustain the statutory requirements in question.

The facts and circumstances shown by the record are these. Zanes-Ewalt oper-
ates a public warehouse in Farmers Branch, Dallas County, Texas. It holds a permit from the State, issued by the Comptroller upon application therefor, to act as a distributing agent under and pursuant to the provisions of the Cigarette Tax Law. Its function is to distribute cigarettes received from the out-of-state tobacco companies.

The tobacco companies ship the cigarettes in cases in carload or truckload lots to Zanes-Ewalt on a regular basis, consigned to the tobacco company in care of Zanes-Ewalt. The cigarettes are unloaded and segregated by Zanes-Ewalt as to brand and are held by Zanes-Ewalt subject to distribution at the direction of the tobacco companies. The cases are not broken by Zanes-Ewalt, except to replace cigarettes damaged in transit. Because of uncertain transit time and the frequency of damage in transit, the cases are not consigned to or marked for a particular distributor when received by Zanes-Ewalt. The cigarettes remain in the Zanes-Ewalt warehouse until ordered for delivery by the particular tobacco company; this is usually for a period of one to seven days. These orders for delivery are in the form of intrastate bills of lading prepared by the tobacco company and later forwarded to Zanes-Ewalt. Ninety-nine per cent of deliveries by Zanes-Ewalt are within the State, either by its trucks or by freight lines on intrastate rates. In effect, the tobacco companies maintain a pool of unconsigned cases of cigarettes in the hands of Zanes-Ewalt, subject to distribution at their direction to the distributors with whom they have contracts. Zanes-Ewalt is compensated by the tobacco companies at an agreed rate per hundred weight of the cigarettes handled.

In resolving the problem of interstate commerce, we first recognize that the taxable incident under the "first sale" definition invoked by the Comptroller, i. e., the loss of the cigarettes from the hands of Zanes-Ewalt, constitutes the imposition of

4. Tex.Tax.-Gen.Ann. art. 7.02(1) (1961)

5. Tex.Tax.-Gen.Ann. art. 7.01(8) (1969)

the cigarette tax directly upon the cigarettes while in the hands of Zanes-Ewalt, prior to their distribution or delivery in fulfillment of the purposes for which they had been received. Under the statutory scheme, however, the cigarettes are "taxed" while in the hands of the distributing agent only when an unaccountable loss of the cigarettes occurs there.

Zanes-Ewalt argues that it serves merely as one phase of an overall interstate cigarette distribution system; further it asserts that the cigarettes remain in interstate and unbroken transit while in its hands and that during such time the cigarettes are immune from the burden of State taxation or control. Zanes-Ewalt thus contends that an exercise at such time of the power of the State to tax and to enforce regulations against the loss is an imposition upon the use of the cigarettes before their interstate journey has ceased; as such, it is an impermissible tax upon commerce.

The position of the Comptroller, on the other hand, is that the continuity of transit is broken upon delivery of the cigarettes to the warehouse of Zanes-Ewalt for its business purposes and those of the tobacco companies and that at such time the cigarettes become subject to the plenary power of the State to tax and regulate.

■ It is the established rule that goods in interstate transit are not subject to local taxation. However, where there is an interruption at a point between the point of origin and the final destination, the controlling principle has been stated as follows: any interruption of the movement of commodities at an intermediate point between origin and final destination which is not incidental to the transportation or the use of the means of transportation (or, being so incidental, is used or extended for the purposes of the owner not incidental to the transportation or the means used therefor) breaks the continuity in transit and subjects the shipment to local taxation at the point of interruption. Anno. 78 L.Ed. 138 (1933). Whether the exercise of the taxing power of the State is forbidden in a particular case is to be determined by the practical operation of the State statute, as applied to the facts of that case. Hughes Brothers Timber Co. v. Minnesota, 272 U. S. 469, 47 S.Ct. 170, 71 L.Ed. 359 (1926).

■ The crucial question in determining whether the taxing power of the State may be exerted is that of "continuity of transit." Carson Petroleum Co. v. Vial, 279 U. S. 95, 49 S.Ct. 292, 73 L.Ed. 626 (1929). There are numerous decisions of the United States Supreme Court that speak to this problem; among these are: Champlain Realty Co. v. Town of Brattleboro, 260 U. S. 366, 376–377, 43 S.Ct. 146, 149, 67 L.Ed. 309, 314 (1922):

. . . If the interruptions are only to promote the safe or convenient transit, then the continuity of the interstate trip is not broken. * * * In other words, in such cases interstate continuity of transit is to be determined by a consideration of the various factors of the situation. Chief among these are the intention of the owner, the control he retains to change destination, the agency by which the transit is effected, the actual continuity of the transportation, and the occasion or purpose of the interruption during which the tax is sought to be levied.

General Oil Co. v. Crain, 209 U.S. 211, 230–231, 28 S.Ct. 475, 482, 52 L.Ed. 754, 765 (1908):

The company was doing business in the state and its property was receiving the protection of the state. Its oil was not in movement through the state. It had reached the destination of its first shipment, and it was held there, not in necessary delay or accommodation to the means of transportation, as in State, Detmold, Prosecutor, v. Engle (1871) 34 J.H.L. 425, but for the business purposes and profits of the company. It was only there for distribution, it is said, to fulfil orders already received. But to do this

required that the property be given a locality in the state beyond a mere halting in its transporation. It required storage there—the maintenance of the means of storage; of putting it in and taking it from storage.

New York ex rel. Pennsylvania R. Co. v. Knight, 192 U.S. 21, 27, 24 S.Ct. 202, 204, 48 L.Ed. 325, 327 (1904):

> But when service is wholly within a state, it is presumably subject to state control. The burden is on him who asserts that, though actually within, it is legally outside, the state; and, unless the interstate character is established, locality determines the question of jurisdiction.

Cities Service Gas Co. v. Peerless Oil & Gas Co., 340 U.S. 179, 186–187, 71 S.Ct. 215, 219–220, 95 L.Ed. 190, 202 (1950):

> The Commerce Clause gives to the Congress a power over interstate commerce which is both paramount and broad in scope. But due regard for state legislative functions has long required that this power be treated as not exclusive. Cooley v. [Society for Relief of Distressed Pilots, Their Widows, etc.] Port Wardens, 1851, 53 U.S. 299, 12 How. 299, 13 L.Ed. 996. It is now well settled that a state may regulate matters of local concern over which federal authority has not been exercised, even though the regulation has some impact on interstate commerce. Parker v. Brown, 1943, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315; Milk Control Board v. Eisenberg Farm Products, 1939, 306 U.S. 346, 59 S.Ct. 528, 83 L.Ed. 752; South Carolina Highway Dept. v. Barnwell Bros., 1938, 303 U.S. 177 [625], 58 S.Ct. 510, 82 L.Ed. 734. The only requirements consistently recognized have been that the regulation not discriminate against or place an embargo on interstate commerce, that it safeguard an obvious state interest, and that the local interest at stake outweigh whatever national interest there might be in the prevention of state restrictions. Nor should we lightly translate the quiescence of federal power into an affirmation that the national interest lies in complete freedom from regulation.

We think it clear under the tests thus articulated that the cigarettes in question had reached a locality in Texas and had become subject to the taxing and regulatory jurisdiction of the State. The business purposes of the out-of-state tobacco companies in the distribution system of their creation, of which Zanes-Ewalt was an integral part, required more than a "mere halting of transportation," in the words of *General Oil Company,* at the warehouse of Zanes-Ewalt; the interruption was not to "promote the safe or convenient transit" of the cigarettes, *Champlain.* The breaking of the interstate continuity of transit enabled the tobacco companies to obtain these business advantages, among others: a reduction of transportation costs by utilizing the lower rates available for shipments in carload or truckload lots, with Zanes-Ewalt breaking down these large shipments for delivery to the purchasers in smaller lots; a check for damage after arrival and the replacement of cigarettes when necessary; and the accomplishment of regular and dependable delivery to the customers of the tobacco companies by means of the pool maintained in the warehouse of Zanes-Ewalt. These activities are local in nature, and subjecting them to regulation in furtherance of the State system of taxation, an obvious State interest, does not discriminate against or place an embargo on interstate commerce. *Cities Service Gas Co.*

This, in turn, points to the fact that it is this very business arrangement, i. e., the distributing agent intermediate between the tobacco companies and their distributors who affix the stamp evidencing payment of the cigarette tax, that exposes the State to loss of tax revenue resulting from the loss of unstamped cigarettes from the hands of the distributing agent. So it was that the Legislature by its "First Sale" definition [and the statute having so defined the phrase, we are not bound by its

usual meaning, Hurt v. Cooper, 130 Tex. 433, 110 S.W.2d 896 (1937), Gifford-Hill & Co. v. State, 442 S.W.2d 320 (Tex. 1969)] imposed the tax upon cigarettes received by the distributing agent which do not reach the distributor by reason of unaccountable loss. This is consistent with the legislative purposes manifest in the Cigarette Tax Law, and particularly in the definition of "distributor," quoted, supra. In our view, this regulatory feature of the Cigarette Tax Law is well within the legislative taxing power and does not offend constitutional requirements of reasonableness and due process. "There is a strong presumption that a Legislature understands and correctly appreciates the needs of its own people, that its laws are directed to problems made manifest by experience . . . ." Texas State Board of Barber Examiners v. Beaumont Barber College, Inc., 454 S.W.2d 729 (Tex.1970); Smith v. Davis, 426 S.W.2d 827 (Tex.1968). So it was that the Legislature amended the definition of "First Sale" in 1969 for the purpose, as stated in the title to the amendatory act, of including the loss of cigarettes, the exact addition being "or the loss of cigarettes in this State whether by negligence, theft, or any other unaccountable loss."

Zanes-Ewalt had notice of, and became subject to, the statutory requirements when it annually applied for and was granted State license to engage in the statutorily defined business of a distributing agent, i. e., in the "business of storing unstamped cigarettes previously sold in interstate commerce and received . . . for distribution or delivery." Zanes-Ewalt became bound to see that the cigarettes so received reached the distributors for affixing of the stamp tax evidencing payment of the cigarette tax; otherwise, it would suffer imposition of the tax upon those cigarettes not doing so. This was a hazard of doing business as a distributing agent known to Zanes-Ewalt. Since the statute represents a valid exercise of legislative power, the fact that it may be harsh as to such business is a matter for exclusive determination by the Legislature. State v. Wynne, 134 Tex. 455, 133 S.W.2d 951 (1939); Davis v. White, 260 S.W. 138 (Tex.Civ. App.1924, writ ref'd); State v. Rope, 419 S.W.2d 890 (Tex.Civ.App.1967, writ ref'd n. 'r. e.); Allied Finance Co. v. State, 387 S.W.2d 435 (Tex.Civ.App.1965, writ ref'd n. r. e.). We do not regard Motor Cargo, Inc. v. Division of Tax Appeals, 10 N.J. 580, 92 A.2d 774 (1962), upon which the intermediate court relied, as persuasive to an opposite result. The decision was written with respect to a shipment in interstate commerce and in a substantially different statutory context; and even as to this, the writing seems overbroad and beyond the writings of this Court in sustaining acts of the Legislature.

The judgments below are reversed and judgment is here rendered that Respondent, Zanes-Ewalt Warehouse, Inc., take nothing by its suit.