NUECES COUNTY APPRAISAL DISTRICT and the Appraisal District Board of the Nueces County Appraisal District, Appellants,

v.

DIAMOND SHAMROCK REFINING AND MARKETING COMPANY, Appellee.

No. 13–91–308–CV.

Court of Appeals of Texas, Corpus Christi.

April 29, 1993.

Rehearing Overruled May 27, 1993.

Russell R. Graham, Calame, Linebarger, Graham & Pena, Austin, for appellants.

Edward Kliewer, III, Kenneth Malone, Foster, Lewis & Langley, San Antonio, for appellee.

## OPINION

SEERDEN, Justice.

This is an ad valorem taxation case. The trial court entered a judgment against the Nueces County Appraisal District and the Appraisal Review Board of the Nueces County Appraisal District which decreed that the crude oil owned by Diamond Shamrock and located within appellants' appraisal jurisdiction on January 1st of 1988, 1989, and 1990, was exempt from ad valorem taxation for those years. By a single point of error, appellants complain that the trial court erred by holding that Diamond Shamrock's property was exempt from taxation. We reverse and render.

The Constitution of the State of Texas provides that "all real property and tangible personal property in this State, unless exempt as required or permitted by this Constitution ... shall be taxed in proportion to its value...." TEX. CONST. art. VIII, § 1(b). *See* TEX. CONST. art. VIII, §§ 1(d), 1–b, 1–j, 1–k, 2. Principles of federal law may limit a state's power to tax. TEX.TAX CODE ANN. § 11.12 (Vernon 1992);[1] *Dallas County Appraisal Dist. v. L.D. Brinkman,* 701 S.W.2d 20, 20 (Tex.App.—Dallas 1985, writ ref'd n.r.e.). Thus, subject only to the state's constitutional exemptions and federal limitations, the State of Texas has the power and the duty to tax any real and

---

1. Section 11.12 of the Texas Tax Code states that "[p]roperty exempt from ad valorem taxation by federal law is exempt from taxation." Other exemptions are delineated in §§ 11.11–11.24 and §§ 11.251–11.30.

tangible personal private property in the state. *Id.* When construing constitutional authorization of tax exemptions, "our courts must resolve any doubts against the exemption because tax exemptions are never favored." *Aransas County Appraisal Review Board v. Texas Gulf Shrimp,* 707 S.W.2d 186, 188 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.).

The following facts, among others, were stipulated by the parties. The crude oil was shipped from foreign sources to American Petrofina's Harbor Island storage facility within the Nueces County Appraisal District to await shipment by pipeline to its final destination, Diamond Shamrock's refinery located approximately 100 miles from Harbor Island in Three Rivers, Texas. None of the crude oil was pumped or sold outside Texas. On January 1, 1988, 323,019 barrels of crude oil were present for no longer than 12 days at the Harbor Island facility; 658,968 barrels were present on January 1, 1989, for no longer than 25.3 days; and, 408,667 barrels were present on January 1, 1990, for no longer than 18.1 days. At all times during the years 1987 through 1990, some volume of crude oil owned by Diamond Shamrock was present in the Harbor Island storage facility. While located in Nueces County, the crude oil received governmental services.

Further, Diamond Shamrock admits that the tax is valid except to the extent that it may be precluded by the Import–Export Clause and the Commerce Clause of the United States Constitution, and, if valid, this property is subject to taxation in appellants' taxing district. The parties also stipulated that if the oil originated from sources within Texas, it would be subject to ad valorem taxation in Texas.

## THE IMPORT–EXPORT CLAUSE

■ The Import–Export Clause states:

No State shall, without the consent of the Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws: and the net produce of all duties and imposts laid by any State on imports or exports, shall be for the use of the treasury of the United States: and all such laws shall be subject to revision and control of the Congress.

U.S. CONST. art. I, § 10, cl. 2.

Diamond Shamrock contends that the oil was in transit to its refinery and immune from property taxes under the Import–Export Clause until it arrived at its final destination in Three Rivers, Texas. Using the traditional analysis of taxation under the Import–Export Clause, as urged by Diamond Shamrock, all taxes, even nondiscriminatory property taxes, on imports and the importing processes are banned by the Clause. *City of Farmers Branch v. Matsushita Elec. Corp. of Am.,* 537 S.W.2d 452, 454 (Tex.1976) (citing *Low v. Austin,* 80 U.S. (13 Wall.) 29, 20 L.Ed. 517 (1871) and *Brown v. Maryland,* 25 U.S. 262, 12 Wheat 419, 6 L.Ed. 678 (1827)). A court's primary consideration, under this traditional approach, is whether the tax under review reaches imports or exports. *Department of Revenue of Washington v. Association of Washington Stevedoring Cos.,* 435 U.S. 734, 752, 98 S.Ct. 1388, 1400, 55 L.Ed.2d 682 (1978).

Diamond Shamrock argues that whether goods are in transit and not subject to local taxation depends on the intent of the parties. Diamond Shamrock relies on cases that determine the validity of the tax by analyzing the character of the taxed property. *Swift Textiles, Inc. v. Watkins Motor Lines, Inc.,* 799 F.2d 697, 699, 700–01, 701 n. 2 (11th Cir.1986); *State v. Anderson, Clayton & Co.,* 92 F.2d 104, 107 (5th Cir.1937), *cert. denied,* 302 U.S. 747, 58 S.Ct. 265, 82 L.Ed. 578 (1937); *Binderup v. Pathe Exch., Inc.,* 263 U.S. 291, 309, 44 S.Ct. 96, 99, 68 L.Ed. 308 (1923).

In *Swift,* the court considered the intent of the parties and whether the shipment was a part of a larger journey originating in a foreign country. It determined whether the intrastate shipment of machinery was a continuation of foreign commerce under the Carmack Amendment to the Interstate Commerce Act. *Swift,* 799 F.2d at 699, 700–01, 701 n. 2. Appellants correctly argue that the intentions of the parties might be relevant for defining the nature of a shipment when the dispute is between

a common carrier and its client and the issues are contractual in nature. However, under the present facts we are concerned, not with a contract as it applies to an appropriate act, but with the validity of a tax imposed upon one of the parties by a third-party taxing district.

Diamond Shamrock cites the following propositions in *Anderson, Clayton.* "[T]he intention existing at the time the movement starts governs and fixes the character of the shipment," and "[t]emporary stoppage within the state, made necessary in furtherance of the interstate carriage, does not change its character." *Anderson, Clayton,* 92 F.2d at 107. Diamond Shamrock relies on cases that reflect the traditional analysis of taxation under the Import–Export Clause.

The United States Supreme Court abandoned the traditional inquiry into the character of the taxed property in *Michelin Tire Corp. v. Wages,* 423 U.S. 276, 279, 96 S.Ct. 535, 537, 46 L.Ed.2d 495 (1976). *See R.J. Reynolds Tobacco Co. v. Durham County, North Carolina,* 479 U.S. 130, 152, 107 S.Ct. 499, 513, 93 L.Ed.2d 449 (1986); *Xerox Corp. v. County of Harris,* 459 U.S. 145, 150–51, 103 S.Ct. 523, 526–27, 74 L.Ed.2d 323 (1982); *Washington Stevedoring,* 435 U.S. at 759, 98 S.Ct. at 1404; *Recent Cases,* 29 VANDERBILT L.REV. 487, 493–94 (1978). In *Michelin,* the Court initiated a new, fundamentally different approach to the Import–Export Clause. Under the contemporary analysis, instead of focusing on whether the property has lost its status as an "import," the Court focused on whether the tax sought to be imposed is an "impost or duty." *Michelin,* 423 U.S. at 290–94, 96 S.Ct. at 543–45; *see Limbach v. Hooven & Allison Co.,* 466 U.S. 353, 360, 104 S.Ct. 1837, 1842, 80 L.Ed.2d 356 (1984); *Louisiana Land & Exploration v. Pilot Petroleum,* 900 F.2d 816, 820–21 (5th Cir.1990), *cert. denied,* 498 U.S. 897, 111 S.Ct. 248, 112 L.Ed.2d 207 (1990). Appellants urge that, under the holding in *Michelin,* the oil was not in transit for taxation purposes. Additionally, even if "in transit," appellants contend that it was not automatically immune from taxation.

"[T]he [Import–Export] Clause was fashioned to prevent the imposition of exactions which were no more than transit fees on the privilege of moving through a State." *Michelin,* 423 U.S. at 290, 96 S.Ct. at 543. The Court in *Michelin* concluded that an exaction by a state would be objectionable if it offended any of the three policy considerations which led the framers to incorporate the Import–Export Clause into the Constitution. These considerations are:

1. [T]he Federal Government must speak with one voice when regulating commercial relations with foreign governments, and tariffs, which might affect foreign relations, could not be implemented by the States consistently with that exclusive power;

2. [I]mport revenues were to be the major source of revenue of the Federal Government and should not be diverted to the States; and

3. [H]armony among the States might be disturbed unless seaboard States, with their crucial ports of entry, were prohibited from levying taxes on citizens of other States by taxing goods merely flowing through their ports to the inland States not situated as favorably geographically.

*Michelin,* 423 U.S. at 285–86, 96 S.Ct. at 540–41. We conclude that the tax at issue in this case offends none of these policies.

First, this property tax can have no impact on the federal government's exclusive regulation of foreign commerce. By definition, it does not fall on imports because of their place of origin. *Michelin,* 423 U.S. at 286, 96 S.Ct. at 541.

■ Second, the federal government retains the exclusive right to all revenues from exactions on imports and exports. Unlike imposts and duties, which are essentially taxes on the commercial privilege of bringing goods into a country, ad valorem property taxes are taxes by which a state apportions the cost of such services as police and fire protection among the beneficiaries. *Michelin,* 423 U.S. at 287, 96 S.Ct. at 541; *Matsushita,* 537 S.W.2d at 454. Although the Import–Export Clause pro-

hibits state taxation based on the foreign origin of the imported goods, it cannot be read to accord imported goods preferential treatment that permits escape from uniform nondiscriminatory taxes for services which the state supplies. *Michelin*, 423 U.S. at 286–87, 96 S.Ct. at 541–42. There is no reason why Diamond Shamrock should not bear its share of these costs.

Diamond Shamrock argues that the only reason for the oil being in the Harbor Island tanks was because it could not be transported out more quickly through the pipeline. However, the stipulations reveal that Diamond Shamrock's Three Rivers storage capacity was only 200,000 barrels while the average volume in the Harbor Island facility on January 1st of the relevant years was 463,550 barrels. It appears that Diamond Shamrock could have stored the oil in these tanks until such time as the capacity of the tanks at Three Rivers could have accepted it. We conclude that a substantial amount of oil was stored in the Harbor Island facility because it had a higher comparable capacity than the tanks at Three Rivers.

Finally, this tax in no way conflicts with the third purpose of the Import–Export Clause. With this concern the framers desired to encourage harmony among the states. *Michelin*, 423 U.S. at 286–88, 96 S.Ct. at 541–42. The crude oil originated totally from foreign sources. It entered the United States at the Harbor Island facility located within the Nueces County Appraisal District. The parties stipulated that the final destination of the crude oil was Three Rivers, Texas. None of the crude oil in question was pumped or sold outside the State of Texas in its present form. The import was concluded when offloaded and put into storage tanks and was stored there continuously until it was transferred to the tanks in Three Rivers. Under these facts, there was never an opportunity for disturbing harmony among the states. This tax has no effect on the cost of property moving to any inland state, but simply requires appellee to bear a share of the cost of government in proportion to its ownership of this property.

· We conclude that once the purposes of the Import–Export Clauses of the United States Constitution have been satisfied, as in this case, the concept of "in transit" loses any rational meaning. At that point the taxability of the property becomes a matter for the state. It is clear that had this oil been produced in another taxing district in Texas and transferred to the Harbor Island Storage facilities under the same circumstances and for the same purposes, Texas law would hold the appellants' tax valid. *See Exxon Corp. v. San Patricio County Appraisal Dist.*, 822 S.W.2d 269 (Tex.App.—Corpus Christi 1991, writ denied). The fact that this crude oil came from a foreign country makes it no more "in transit" under Texas law than it would have been in the *Exxon* case.

We hold that the Import–Export Clause does not prohibit the tax in this case.

### THE COMMERCE CLAUSE

■ The Commerce Clause grants Congress power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian tribes...." U.S. CONST. art. I, § 8, cl. 3.

Initially, Diamond Shamrock contends that because appellants failed to brief or argue the Commerce Clause question, they have waived the right to challenge the trial court's judgment on that issue. However, appellants filed a reply brief that argues the validity of the tax under the Commerce Clause. The issue has not been waived on appeal.

Diamond Shamrock urges that the traditional rule which provides a blanket prohibition against any state taxation imposed directly on an interstate [or foreign] transaction, applies in this case. *See Freeman v. Hewit*, 329 U.S. 249, 256–57, 67 S.Ct. 274, 278–79, 91 L.Ed. 265 (1946). Appellants contend that the Supreme Court has abandoned the traditional analysis of interstate and international commerce immunities from state taxation, and has moved to a review of the tax in question to determine whether it discriminates against such commerce or fairly relates to services provided by the State or both. *See Michelin*, 423

U.S. at 286–89, 96 S.Ct. at 541–42; *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 282, 97 S.Ct. 1076, 1080, 51 L.Ed.2d 326 (1977); *Washington Stevedoring,* 435 U.S. at 753, 98 S.Ct. at 1400; *Colonial Pipeline Co. v. Traigle,* 421 U.S. 100, 108, 95 S.Ct. 1538, 1543, 44 L.Ed.2d 1 (1975).

■ *Complete Auto* sets out the test for the validity of taxes on interstate commerce. A tax is sustainable against a Commerce Clause challenge when the tax 1) is applied to an activity with a substantial nexus with the taxing state, 2) is fairly apportioned, 3) does not discriminate against interstate commerce, and 4) is fairly related to the services provided by the State. *Complete Auto,* 430 U.S. at 279, 97 S.Ct. at 1079; *see Washington Stevedoring,* 435 U.S. at 750, 98 S.Ct. at 1399. The Court in *Japan Line, Ltd. v. County of Los Angeles,* 441 U.S. 434, 451, 99 S.Ct. 1813, 1823, 60 L.Ed.2d 336 (1979), formulated a more extensive foreign commerce clause test by adding two inquiries to the existing *Complete Auto* interstate commerce clause test: 1) whether the tax, notwithstanding apportionment, creates a substantial risk of international multiple taxation, and 2) whether the tax may impair federal uniformity and prevent the federal government from speaking with one voice when regulating commercial relations with foreign governments. *Japan Line,* 441 U.S. at 448, 451, 99 S.Ct. at 1821, 1823. We conclude that the foreign commerce clause test is satisfied, thus, no impermissible burden on this foreign commerce exists.

Diamond Shamrock urges the tax in question is impermissible under either the *Complete Auto* or the *Japan Line* tests. Under the first prong of *Complete Auto,* Diamond Shamrock contends that the crude oil did not have a sufficient nexus to Nueces County because it was only entering, exiting, or passing through the county. The stipulated facts reveal that some of Diamond Shamrock's oil was present within appellants' boundaries at all times during the tax years in question. The oil was consumed in the state. The oil present on January 1st of each of the three years remained for a period of 12, 25, and 18

days, respectively. The oil received governmental services in Nueces County. We conclude that the oil had a substantial local nexus with the taxing entity, satisfying prong one.

Under the second prong of *Complete Auto,* Diamond Shamrock contends that because appellants' tax is on the full value of the oil on the assessment date, it does not meet the apportionment requirement of *Complete Auto.* We disagree.

The apportionment test is designed to avoid multiple taxation of the same property or activity among the states or nations. Its purpose "is to ensure that each State taxes only its fair share of an interstate transaction." *Goldberg v. Sweet,* 488 U.S. 252, 260, 109 S.Ct. 582, 588, 102 L.Ed.2d 607 (1989). Under the facts of this case, no multiple burdens were demonstrated. The tax could occur in no other state because the oil had no contact with any other state. Additionally, the facts revealed no apportionment issue involving the importing country.

■ Even if there were an apportionment issue as it relates to the portion of the property present within the county's boundary, the burden of proving the tax unfair or that an exemption applies is on the taxpayer who makes such a claim. *See Central R.R. Co. of Pennsylvania v. Pennsylvania,* 370 U.S. 607, 613–17, 82 S.Ct. 1297, 1302–04, 8 L.Ed.2d 720 (1962). To meet his burden the taxpayer must show that the taxing state is taxing more than its fair share of the property's value. The record reveals Diamond Shamrock contested neither the volume nor the value of the property which appellants sought to tax. As a result, it has waived any claim that this state has sought to impose a tax on more than its fair share of the property. If property is located in the taxing district on the assessment day, the presumption is that it is taxable. The burden should be on the person or entity taxed to prove otherwise. *See* TEX.TAX CODE ANN. § 21.02(1) (Vernon 1992); *Davis v. City of Austin,* 632 S.W.2d 331, 333 (Tex.1982).

The record contains nothing that shows the tax discriminates against interstate or

foreign commerce, the third prong of *Complete Auto*. Clearly, this nondiscriminatory tax passes this test because the taxing state only taxed that property which was present within its boundaries and received governmental services regardless of its origin or its destination.

Under *Complete Auto*'s fourth prong, "the tax is fairly related to the services provided by the State," Diamond Shamrock repeats its argument involving nexus and appropriation with the same result: the facts, as articulated under prong one, show a clear relationship exists between the tax and the services provided. Thus, the fourth prong is met.

Next, we review the two foreign commerce requirements identified in *Japan Line*. Diamond Shamrock asserts that the tax enhances the risk of multiple taxation and impairs federal uniformity. Specifically, Diamond Shamrock urges that full taxation on goods in transit may provoke retaliation by foreign nations. Relying on *Japan Line*, Diamond Shamrock argues that since appellants taxed the crude oil on its full value, multiple taxation is inevitable and the United States has no way to prevent that multiple taxation. *See Japan Line*, 441 U.S. at 447, 99 S.Ct. at 1820.

The property in question in *Japan Line* was shipping containers owned by Japan Line, Inc., a Japanese domiciliary. *Japan Line*, 441 U.S. at 436, 99 S.Ct. at 1815. The containers were repeatedly sent back and forth between Japan and the United States. *Id.* All containers were subject to property tax in Japan and, in fact, were taxed in Japan. *Id.* The County of Los Angeles sought to tax the same entity on the assessed value of the containers present in its jurisdiction on the assessment date. *Id.* at 437, 99 S.Ct. at 1815. The Court held that because Japan had the right to tax the property value of the containers in full, California's tax necessarily produced multiple taxation. *Id.* at 447, 99 S.Ct. at 1820. The Court further held that the California tax prevented the United

States from speaking with one voice in foreign affairs because the risk of retaliation by Japan, under these circumstances, was acute. *Id.* at 453, 99 S.Ct. at 1824.

No similar facts exist in the present case. Once the crude oil enters this country, the application of appellants' tax does not necessarily result in double taxation. In fact, it is undisputed that if the property is subject to property taxes in Texas, its taxable situs is Nueces County, thus avoiding the possibility of double taxation within the state. Diamond Shamrock's arguments under *Japan Line* concerning an enhanced risk of multiple taxation and an impairment of federal uniformity have no application in this case.

Finally, an ad valorem property tax that conflicts with the three basic purposes of the Import–Export Clause would also be invalid under the Commerce Clause analysis because the policies animating both clauses are much the same. *Japan Line*, 441 U.S. at 449 n. 14, 99 S.Ct. at 1822 n. 14. As previously discussed, no conflict exists between this tax and the federal government's exclusive regulation of foreign commerce or its exclusive right to all revenues from exactions on imports and exports, or the framers' desire to encourage harmony among the states.

We hold that the tax is sustainable against a Commerce Clause challenge.

Because the Import–Export Clause and the Commerce Clause have no application in this case, the law of the State of Texas applies. Thus, we conclude that Diamond Shamrock's crude oil located in the Harbor Island facility on January 1st of 1988, 1989, and 1990 is not exempt from the ad valorem property taxes for those years.

We reverse the judgment of the trial court and render that Diamond Shamrock's property is not qualified as exempt property.

Concurring opinion by DORSEY, J.

Dissenting opinion by Assigned Justice GERALD T. BISSETT[2], joined by NYE, C.J., and KENNEDY, J.

2. Assigned to this Court by the Chief Justice of the Supreme Court of Texas pursuant to Tex.

Gov't Code Ann. § 74.003 (Vernon 1988).

DORSEY, Justice, concurring.

I join in the well-written majority opinion authored by Justice Seerden. I write to express my analysis of the case, because I do not believe the following issue is illuminated by the exegesis of the dissent.

Both the Import–Export Clause and the Commerce Clause of the federal constitution prohibit a state from levying a duty on goods passing through that state, when those goods originate from and are destined for a foreign land or sister state. If the goods are merely "passing through" bound for another jurisdiction, they are in transit and not subject to the local state's taxation.

The oil at issue was produced abroad, transported by ship until unloaded into the terminal at Harbor Island, located in Nueces County, Texas. The oil will be transported from there by pipeline to a refinery in Live Oak County, Texas, where it will be refined and transformed into gasoline and other products. There is no assertion that the resulting gasoline and related products will be transported from Texas to be consumed elsewhere. The oil is owned by Diamond Shamrock at all relevant times.

The issue in the present case is whether the State of Texas may tax the oil in the storage tanks in Nueces County. The issue is *not* which taxing entity within the State of Texas is the proper taxing agency. The Import–Export and Commerce Clauses are restrictions on the State vis-a-vis the Federal Government. If the goods sought to be taxed cease being in transit within the state, the State may impose non-discriminatory ad valorem taxes.

The power of the State to tax being at issue, it is not important where within the state the material finally comes to rest and ceases to be in transit. It is immaterial for federal constitutional purposes that the final destination of the imported crude oil is Nueces County or Live Oak County, Texas. If the State of Texas has jurisdiction to tax, a dispute regarding which taxing authority within the state may levy ad valorem taxes is determined by state law. Neither the Import–Export Clause nor the

Commerce Clause of the United States Constitution is implicated.

GERALD T. BISSETT, Justice (Assigned), dissenting.

I respectfully dissent. I would hold that both the Import–Export Clause and the Commerce Clause in the United States Constitution prohibit the tax in this case.

First, in addition to the summary of the facts set out in the majority opinion, I add the following facts which were stipulated by the parties:

The crude oil at issue originates totally from foreign sources, and is transmitted by ships through the Gulf of Mexico to the Harbor Island storage facility located within the Nueces County Appraisal District as part of and incident to the transportation of the crude oil to its ultimate destination outside the Nueces County Appraisal District. The presence of the crude oil within the Nueces County Appraisal District, while in transit to its ultimate destination, is reasonably necessary for the accommodation of the transportation of the crude oil into two (2) pipelines owned by American Petrofina which transports the crude oil 36.2 miles to a metering station in Refugio, Texas, from which it is pumped 65 miles in a pipeline owned by plaintiff to its ultimate predetermined destination, the Plaintiff's refinery located in Three Rivers, Texas. Plaintiff does not divert the oil to any other facility other than the Three Rivers refinery.

No manufacturing, assembly, servicing, processing, commingling with other oil from other sources, or refining of any kind is performed on the subject crude oil while located within the Nueces County Appraisal District, while the crude oil is awaiting its accommodation of transportation to its ultimate destination.

\* \* \* \* \* \*

[I]n 1988, the owner of the Harbor Island storage facility paid One Hundred Twenty–Nine Thousand Six Hundred Seventy-nine and 70/100 Dollars ($129,-679.70) in ad valorem taxes, in 1989 paid One Hundred Thirty-three Thousand Two

Hundred Six and 53/100 Dollars ($133,-206.53) in ad valorem taxes and in 1990 paid One Hundred Forty Thousand Nine Hundred Three and 17/100 Dollars ($140,903.17) in ad valorem taxes.

## THE IMPORT–EXPORT CLAUSE

The majority relies primarily upon the holding in *Michelin Tire Corp. v. Wages,* 423 U.S. 276, 96 S.Ct. 535, 46 L.Ed.2d 495 (1976), as authority for holding "that the trial court erred in holding that Diamond Shamrock's property was exempt from taxation." That case differs in a very material and substantial way from the facts in the case at bar.

In *Michelin,* the taxing authorities of Guinsett County, Georgia, assessed ad valorem taxes against tires and tubes imported by the taxpayer (Michelin) from foreign sources that were included on the assessment dates in an inventory maintained at its wholesale distribution center in the county. The *Michelin* Court noted that "nothing in the history of the Import–Export Clause remotely suggested that a non-discriminatory ad valorem property tax, also imposed on imported goods *that are no longer in transit* was objectionable to the Framers of the Constitution." (Emphasis added). *Michelin,* 423 U.S. at 286, 96 S.Ct. at 541. In discussing the third policy consideration set out in the opinion "the preservation of harmony between the states," the Court observed that the Clause "prevented imposition of exactions that were no more than transit fees on the privilege of moving through a State." *Id.,* 423 U.S. at 290, 96 S.Ct. at 543. The Court then said that non-discriminatory ad valorem property taxes stand on a different footing,

and to the extent there is any conflict whatsoever with this purpose of the Clause, it may be secured merely by prohibiting the assessment of even nondiscriminatory property taxes on goods which are merely in transit through the State when the tax is assessed.

*Id.,* 423 U.S. at 290, 96 S.Ct. at 543.

It appears that the Court's language, quoted above, when read in context, is that a tax on goods in transit, for merely moving through a taxing jurisdiction, like appellants' tax herein, is prohibited.

The focus of the above quoted language of the Court in *Michelin* is not on the "through the State," but is on the "in transit" nature of the goods. *Id.* The critical inquiry is not whether the leg of the journey in the United States crosses a state border, but whether the leg of the journey in the United States was intended to be a part of a larger journey that originated in a foreign nation.

It was held in *Michelin:*

*Petitioner's tires in this case were no longer in transit.* They were stored in a distribution warehouse from which petitioner conducted a wholesale operation, taking orders from franchised dealers and filling them from a constantly replenished inventory. The warehouse was operated no differently than would be a distribution warehouse utilized by a wholesaler dealing solely in domestic goods, and we therefore hold that the nondiscriminatory property tax levied on petitioner's inventory of imported tires was not interdicted by the Import–Export Clause of the Constitution. (Emphasis added)

*Id.,* 423 U.S. at 302, 96 S.Ct. at 548.

The United States Supreme Court stated in *R.J. Reynolds Tobacco Co. v. Durham County, N.C.,* 479 U.S. 130, 107 S.Ct. 499, 93 L.Ed.2d 449 (1986):

This Court has observed that in *Michelin* it limited its holding to the imported goods 'no longer in transit'.... The imported tobacco here, we repeat, has nothing transitory about it: it has reached its State,—indeed, its County—of destination....

*Id.,* 479 U.S. at 154–55, 107 S.Ct. at 514.

In *Department of Revenue v. Association of Washington Stevedoring Cos.,* 435 U.S. 734, 754–55, 98 S.Ct. 1388, 1401–02, 55 L.Ed.2d 682 (1978), the goods were in transit. The tax was not upon the goods themselves, but was on the business or occupation of stevedoring, loading and unloading cargo, which occurred entirely within the

state. By undertaking this analysis and upholding the tax because it was not on the goods in transit, the court again recognized that goods in transit are not taxable. The court specifically observed that the immunity of services incidental to interstate transit is not so broad as the immunity of the goods themselves. Justice Powell noted in his concurring opinion that while the nondiscriminatory tax in *Michelin* was held not to violate any of the policies that underlie the Import–Export Clause,

> the Court suggested that even a nondiscriminatory tax on goods merely in transit through the state might run afoul of the Import–Export Clause.

*Id.,* 435 U.S. at 762, 98 S.Ct. at 1405.

It has long been the rule under federal law that the States may not tax personal property actively in transit. Mr. Justice Rutledge stated in *Independent Warehouses, Inc. v. Scheele,* 331 U.S. 70, 67 S.Ct. 1062, 91 L.Ed. 1346 (1947):

> [I]f the interstate movement has begun, it may be regarded as continuing, so as to maintain the immunity of the property from state taxation, despite temporary interruptions due to the necessities of the journey ... mere changes in the method of transportation do not affect the continuity of the transit....

*Id.,* 331 U.S. at 73, 67 S.Ct. at 1064–65.

It was stated in *Champlain Realty Co. v. Town of Brattleboro,* 260 U.S. 366, 376–77, 43 S.Ct. 146, 149, 67 L.Ed. 309, 314 (1922):

> [I]f the interruptions (of the goods in transit) are only to promote the safe or convenient transit, then the continuity of the interstate trip is not broken.... In other words, in such cases interstate continuity of transit is to be determined by a consideration of the various factors of the situation. Chief among these are the intention of the owner, the control he retains to change destination, the agency by which the transit is effected, the actual continuity of the transportation, and the occasion or purpose of the interruption during which the tax is sought to be levied.

*See also, Hughes Brothers Timber Co. v. Minnesota,* 272 U.S. 469, 471, 47 S.Ct. 170, 171, 71 L.Ed. 359 (1926); *General Oil Co. v. Crain,* 209 U.S. 211, 230–31, 28 S.Ct. 475, 482, 52 L.Ed. 754, 765 (1908); *Texas v. Anderson, Clayton & Co.,* 92 F.2d 104, 107 (5th Cir.1937), *cert. denied,* 302 U.S. 747, 58 S.Ct. 265, 82 L.Ed. 578 (1937).

The Supreme Court of Texas promulgated the following rule in *Calvert v. Zanes–Ewalt Warehouse, Inc.,* 502 S.W.2d 689 (Tex.1973), *appeal dism'd,* 416 U.S. 923, 94 S.Ct. 1921, 40 L.Ed.2d 279 (1974):

> It is the established rule that goods in interstate transit are not subject to local taxation. However, where there is an interruption at a point between the point of origin and the final destination, the controlling principle has been stated as follows: any interruption of the movement of commodities at an intermediate point between origin and final destination which is not incidental to the transportation or the use of the means of transportation (or, being so incidental, is used or extended for the purposes of the owner not incidental to the transportation or the means used therefor) breaks the continuity in transit and subjects the shipment to local taxation at the point of interruption....
>
> \* \* \* \* \* \*
>
> The crucial question in determining whether the taxing power of the State may be exerted is that of "continuity of transit."

*Id.,* 502 S.W.2d at 692.

The same rules apply in a case where the property is in foreign transit, as it was in the instant case.

In *City of Farmers Branch v. Matsushita Elec. Corp.,* 537 S.W.2d 452 (Tex.1976), *cert. denied,* 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976), the court stated that it understood *Michelin* to hold

> that where the tax is not upon the importation or movement of imported goods, and *where the goods are no longer in transit,* the goods are subject to the imposition of nondiscriminatory ad valo-

rem property taxation by the states and their subdivisions. (Emphasis added) *Id.* at 453.

What *Michelin* did was to shift the inquiry from the "original package" doctrine and the "mingled with other goods in the state" test regarding goods that were no longer "in transit." *See Michelin*, 423 U.S. at 294–302, 96 S.Ct. at 544–48. *Michelin* did not, however, apply this analysis to goods that were still in transit. *Michelin*, 423 U.S. at 286, 290 & 300–01, 96 S.Ct. at 541, 543 & 547–48.

*Michelin* did not determine whether the tires and tubes in fact were imports under the Import–Export Clause; instead it focused on the nature of the tax. It decided that the tax did not offend any of the three policies that were to be served under the Clause. The *Michelin* Court left open the question of whether a tax on foreign goods would constitute an "impost" or "duty" under the Clause. *See Louisiana Land & Exploration Co. v. Pilot Petroleum*, 900 F.2d 816, 820 (5th Cir.1990), *cert. denied*, 498 U.S. 897, 111 S.Ct. 248, 112 L.Ed.2d 207 (1990).

To permit a coastal state to impose a direct tax on foreign goods in the import and export streams of foreign commerce would circumvent the objection that the United States Government must speak with one voice when regulating commercial relations with foreign governments. The taxes levied by the Appraisal District are not an indirect tax like the taxes levied in *Michelin* and *Washington Stevedoring;* they are not taxes on stored inventory (*Michelin*), nor are they taxes on a business which is related to imports or exports (*Washington Stevedoring*). Instead, the taxes in the present case are direct taxes levied on the goods themselves while they are in transit. *See, Louisiana Land & Exploration*, 900 F.2d at 821.

As a general rule, goods stopped in transit for reasons other than necessary transportation accommodations cease to be in transit so that taxation of such goods in the state is proper. However, once the interstate or foreign commerce is established at the time movement begins, the temporary stoppage within the state made necessary in order to deliver the goods to its final destination does not change the character of the goods. The goods are still in foreign commerce and retain such character until they reach their final destination.

The only purpose for the stopover at Harbor Island in the case now before this court was to accommodate the transportation of oil to its final destination. "In all shipments by water there are delays at the seaport.... It would be idle to say that such delays break the continuity of the interstate journey and cause the freight to come to rest within the state." *Anderson, Clayton*, 92 F.2d at 107. The change in the mode of transportation from ship to pipeline effected at Harbor Island was absolutely necessary, and it did not affect the continuity of the transit of appellee's oil. *See Hughes Bros.*, 272 U.S. at 474, 47 S.Ct. at 172. This change was part of the transit itself. The stoppage in the transportation of the oil was not for the benefit of appellee. No profit to appellee can be attributed to such stoppage.

All of the crude oil in question originated from foreign sources, was brought to the United States by ship, and its final destination was intended by appellee to be Three Rivers, Texas, which was not within the Nueces County Appraisal District. It was located at American Petrofina's Harbor Island storage facility, in Nueces County, on January 1 of the relevant years, only "as part of and incident to" its transportation to its ultimate, predetermined and final destination. The stopover at Harbor Island was necessary to effectuate the change in means and mode of transportation from ship to pipeline. The last 100 inland miles of the continuous trip from the storage facility at Harbor Island in Nueces County to appellee's refinery were, by necessity, made first by an American Petrofina's pipeline and then by appellee's pipeline from Refugio, Texas, to the refinery. The accommodation of transportation for this last leg of the journey resulted in none of the oil being present at Harbor Island for more than 25.3 days during any tax years con-

cerned here, and in 1988 none was present for more than 12 days. While some of appellee's oil was present at the facility at all times during the years 1988, 1989, and 1990, it was there at all times as a part of and incident to this transportation process to its predetermined destination, the refinery.

The majority reasons that appellee's oil is taxable by them even though it is "in transit," relying upon *Youngstown Sheet and Tube Co. v. Bowers*, 358 U.S. 534, 79 S.Ct. 383, 3 L.Ed.2d 490 (1959), and *R.J. Reynolds Tobacco Co. v. Durham County, N.C.*, 479 U.S. 130, 107 S.Ct. 499, 93 L.Ed.2d 449 (1986). The reliance is misplaced.

In *Youngstown*, the goods (ore and lumber) were at their final destination and were being used in the company's manufacturing process. By contrast, when appellants in the present case sought to tax appellee's oil, it was not then in appellee's manufacturing process; it was in the custody of another company, American Petrofina, solely incident to and for the purpose of transporting it to appellee's refinery.

If irrevocable commitment to supply appellee's refinery was all that was required, the *Youngstown* Court's discussion of the actual use of the goods at the final destination would have been superfluous. *See Youngstown*, 358 U.S. at 546–47, 79 S.Ct. at 390–91. *Youngstown* upheld the tax because the court found that the manufacturer there had so acted upon the goods as to cause them to lose their import character

> by irrevocably committing them, *after their importation journeys [had] definitely ended,* to "use in manufacturing" at the plant and point of final destination, and by "entering" and "using" them "in manufacturing" at that place[.] (Emphasis added)

*Youngstown*, 358 U.S. at 543, 79 S.Ct. at 388. Here again, the court's entire consideration of all these factors would have been utterly useless if merely entering the state was sufficient to invoke the power to tax. All the court would have had to find was that the goods were in the state; therefore, they were taxable.

In *R.J. Reynolds*, the Court upheld the tax against an Import–Export challenge because the tax was levied by state taxing agencies on tobacco that was stored in customs bounded warehouses, for two years where, customarily, *Reynolds* cleaned, sorted, repacked, as well as stored, the tobacco. The warehouses were owned by *Reynolds*. The Court concluded that no congressional intent to confer "in transit" status on all goods could be inferred, and held that the tobacco was not "in transit" and that the tax was permissible since the tobacco had reached its final destination.

In *Michigan–Wisconsin Pipe Line Co. v. Calvert*, 347 U.S. 157, 74 S.Ct. 396, 98 L.Ed. 583 (1954), the pipeline company maintained a continuous flow of gas from Texas to its consumer outside Texas. Nothing was done to the gas at the point of taking; it was unchanged. The Court held that a tax on the taking of the gas into the pipeline was a tax on actual movement in commerce, and therefore, was impermissible.

The taxes which appellants propose to levy against appellee's oil are not a *quid pro quo* for direct benefits conferred upon appellee by the State of Texas and Nueces County. This oil merely passes through appellants' jurisdiction. Undoubtedly, American Petrofina, the owner of the Harbor Island storage facility, receives benefits from the State and Nueces County. These benefits may arguably inure indirectly to appellee's oil in American Petrofina's care, custody, and control; however, appellants are fully compensated for any indirect benefits they confer on appellee's oil by taxes in the thousands of dollars paid on the facility by American Petrofina. That facility is properly taxed on the basis of its use and the income from that use is reflected in its taxable value and the taxes ultimately paid. *See* Tex.Tax Code Ann. §§ 1.04 & 23.01 (Vernon 1982, Supp. 1991). In turn, appellee pays for any benefits indirectly conferred on it in that the price it pays to American Petrofina for temporary storage includes price factors in American

Petrofina's ad valorem tax costs. The imposition of appellants' tax on appellee's oil as it merely passes through Nueces County would, thus, result in appellee paying for any minimal services it might receive at a greater rate than those present full time in the Appraisal District would pay for full time services.

In summary, the federal courts and the Texas Supreme Court have established the following criteria to determine whether the goods are in transit: 1) was there a stoppage in transportation, and if so, what was the purpose of the stoppage; 2) at the time of taxation was the final destination of the goods determinable; and 3) was the stoppage a necessary delay, or an accommodation to the means of transportation, or for business purposes and profits of the company. *County of Harris v. Xerox Corp.*, 619 S.W.2d 402, 406 (Tex.Civ.App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.), *reversed on other grounds*, 459 U.S. 145, 103 S.Ct. 523, 74 L.Ed.2d 323 (1982).

The tax in the instant case is a direct tax on imported goods within the meaning of *Richfield Oil Corp. v. State Board of Equalization*, 329 U.S. 69, 78–79, 67 S.Ct. 156, 161–62, 91 L.Ed. 80 (1946), and as such is in violation of the Import–Export Clause.

I am of the opinion that the stoppage of the oil at the storage facility in preparation for its movement by pipelines to its final destination at appellee's refinery in Live Oak County did not deprive the oil of its foreign character. *See Anderson, Clayton & Co.*, 92 F.2d at 107.

None of the authorities cited in the majority opinion present facts that are in any way similar to those in the case at bar. In those cases, the goods had reached their final destination and had thereby lost their foreign or interstate character, or the tax was levied on activity of a business concerning imports and exports. That is not the case here.

The conclusion by the majority "that a substantial amount of oil was stored in the Harbor Island facility because it had a higher comparable capacity than the tanks at Three Rivers" is not warranted by the stipulation of facts. Furthermore, it is

highly speculative and is not "backed up" by any facts.

I conclude that the Import–Export Clause exempts the oil in question from ad valorem taxation, and the judgment of the trial court should be affirmed for that reason alone.

## THE COMMERCE CLAUSE

The crude oil was also exempt from taxation by appellants by the Commerce Clause of the United States Constitution, reading

Section 8. The Congress shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States;

\*　　\*　　\*　　\*　　\*　　\*

To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes;

\*　　\*　　\*　　\*　　\*　　\*

U.S. Const. art. I, § 8, Cl. 3.

The Clause is not only a grant of power to Congress, but is a limitation upon the power of the states. *See Richfield Oil Corp. v. State Board of Equalization*, 329 U.S. 69, 75, 67 S.Ct. 156, 159, 91 L.Ed. 80 (1946).

A leading case on the subject is *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977), in which it was held that state ad valorem taxes may be assessed on interstate commerce goods when the tax is applied to an interstate activity

with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State.

*Id.*, 430 U.S. at 274, 97 S.Ct. at 1076. The same rule applies to foreign commerce.

The first requirement in *Complete Auto* is that the *activity* taxed have a nexus within the state. There, Mississippi imposed a tax on gross income derived from

the transportation of persons or property within the state. The petitioner's business was to deliver automobiles, assembled outside the state and shipped into it, to dealers in the state for sale. The Court rejected prior authorities, holding that a tax on the privilege of carrying on certain *activities* in a state in connection with an interstate business is not *per se* violative of the Commerce Clause, and upheld the tax. The Court, in so deciding, assumed that the transportation of the automobiles in the state was interstate commerce. The Court thus recognized that had the automobiles in question not been in transit in interstate commerce, there would have been no complaint possible about the tax.

The central purpose of the *Complete Auto* requirement of fair apportionment is to insure that each State taxes only its fair share of an interstate transaction. *Goldberg v. Sweet*, 488 U.S. 252, 109 S.Ct. 582, 102 L.Ed.2d 607 (1989). Since appellants' tax is on full value, and unapportioned, it appears, without further analysis, that this tax does not meet the apportionment requirement. *See Tyler Pipe Indus., Inc. v. Washington State Dept.*, 483 U.S. 232, 251, 107 S.Ct. 2810, 2822, 97 L.Ed.2d 199 (1987). Thus, appellants' tax is improper for this reason alone.

The third prong of the *Complete Auto* test, which prohibits taxes that discriminate against commerce, has a deeper meaning than the mere prohibition of the allocation of tax burdens between insiders and outsiders in a facially discriminatory manner.

The fourth prong of the *Complete Auto* test is closely related to the first. The purpose of this prong is to insure that a state's tax burden is not placed upon persons who do not benefit from services provided by the State. *Commonwealth Edison v. Montana*, 453 U.S. 609, 626, 101 S.Ct. 2946, 2958, 69 L.Ed.2d 884 (1981). The requirement of the fourth prong goes beyond that of the first in that the first prong requirement of a nexus of the goods themselves with the state must be met before *any* tax may be levied. *Id.* Beyond that threshold requirement, the fourth

prong additionally requires that the *measure* of the tax must be reasonably related to the extent of the contact.

In *American Trucking Ass'ns, Inc. v. Scheiner*, 483 U.S. 266, 283–85, 107 S.Ct. 2829, 2840–41, 97 L.Ed.2d 226 (1987), the Court held that Pennsylvania's flat tax on the operation of all trucks on the state's highways imposed a disproportionate burden on interstate trucks, as compared with intrastate trucks, because the interstate trucks traveled fewer miles. As indicated hereinabove, appellants' tax operates similarly in that full taxes are assessed for the brief period in which appellee's oil passes through the taxing jurisdiction. *Scheiner* stands for the proposition that the requirement of fair apportionment is expressed in the tests of internal and external consistency. Thus, since the tax here is on the full value of appellee's oil and is not apportioned at all, it discriminates against the foreign commerce concerned here.

In *Memphis Natural Gas Co. v. Stone*, 335 U.S. 80, 81–3, 68 S.Ct. 1475, 1475–76, 92 L.Ed. 1832 (1948), petitioner asserted that a franchise tax on capital used within the state solely for interstate business violated the Commerce Clause. The tax was *not on the gas* that passed through petitioner's pipelines *but on property* and operations in the state. The Court found that the tax was not on commerce itself and there was no possibility of multiple taxation and upheld the tax.

Underlying all these cases, indeed all the cases on the Commerce Clause (and the Import–Export Clause), is the very principle upon which the instant case turns. That is, that *goods in transit* from a foreign source may not be taxed. If this were not true, the distinctions and discussions in these cases would be superfluous because all goods would be subject to any tax as soon as they cross into the taxing state. No inquiry beyond whether the goods had crossed the state line would be necessary. In each of these cases, however, the inquiry goes far beyond this basic question. This additional inquiry is necessary because goods initially in transit remain in

transit until they reach their actual predetermined and intended destination.

The test or standard for review in the instant case involves ad valorem taxes on foreign commerce, and is set forth in *Japan Line Ltd. v. Los Angeles County*, as follows:

[W]e believe that an inquiry more elaborate than that mandated by *Complete Auto* is necessary when a State seeks to tax the instrumentalities of foreign, rather than of interstate, commerce. In addition to answering the nexus, apportionment, and nondiscrimination questions posed in *Complete Auto*, a court must also inquire, first, whether the tax, notwithstanding apportionment, creates a substantial risk of international multiple taxation, and second, whether the tax prevents the Federal Government from "speaking with one voice when regulating commercial relations with foreign governments." If a state tax contravenes either of these precepts, it is unconstitutional under the Commerce Clause.

*Id.*, 441 U.S. at 451, 99 S.Ct. at 1823.

This test affects foreign commerce. It is applied because "[w]hen construing Congress' power to regulate Commerce with foreign Nations," a more extensive Constitutional inquiry is required. This more extensive inquiry encompasses the *Complete Auto* test plus the "two additional considerations" set out in *Japan Line*. The tax concerned in this case, however, is not permissible under either the *Complete Auto* test or these additional considerations.

The first of the additional considerations articulated in *Japan Line* is "the enhanced risk of multiple taxation." *Id.*, 441 U.S. at 446, 99 S.Ct. at 1820. In the context of interstate commerce, the requirement of apportionment and the corollary preclusion of taxation of all the property prevents multiple taxation. In the context of foreign commerce, full and proper apportionment cannot be ensured. Thus, even if state taxes are "fairly apportioned," multiple taxation on foreign commerce on "more than one full value" may still result in a "risk of double tax burden to which commerce is not exposed, and which the commerce clause forbids." *Id.*, 441 U.S. at 447–48, 99 S.Ct. at 1820–21. "[A] slight overlapping of tax—a problem that might be deemed *de minimis* in a domestic context—assumes greater importance in the context of foreign commerce." *Id.*, 441 U.S. at 456, 99 S.Ct. at 1825.

The second of the additional considerations beyond the *Complete Auto* test as set out in *Japan Lines* is that the state tax "may impair federal uniformity in an area where uniformity is essential." *Id.*, 441 U.S. at 448, 99 S.Ct. at 1821. While the constitutional grant to Congress by the Commerce Clause of power to regulate commerce between the states and foreign nations is made in parallel phrases, there is evidence that the intended scope of the foreign commerce power is to be the greater. A state tax may impair this greater power and frustrate achievement of federal uniformity. *Id.*, 441 U.S. at 449, 99 S.Ct. at 1822. For instance, where states impose apportioned taxes, international disputes over reconciling apportionment formulas may arise.

The "operating incident" of the tax herein is the mere presence of the oil in the taxing jurisdiction: the oil's transit through Nueces County. The oil is there temporarily, in the Harbor Island facility, which is sought to be fully taxed with the use of the facility for temporary oil storage (services) factored into the tax.

I would hold that the lack of a sufficient nexus of the oil with the Appraisal District, the failure of the tax to pass the test set out in *Complete Auto*, and the failure to meet the requirements of "additional considerations" required by *Japan Line*, causes the tax in question to be in violation of the Commerce Clause of the United States Constitution, and, therefore, it is impermissible. Moreover, if appellant's tax did not violate the Import–Export Clause, it would violate the Foreign Commerce Clause by preventing the United States from "speaking with one voice" with respect to the taxation of foreign goods while they were in international commerce.

I would affirm the judgment of the trial court.