HARRIS COUNTY APPRAISAL DISTRICT and Harris County Appraisal Review Board, Appellants,

v.

**VIRGINIA INDONESIA COMPANY,** Appellee.

No. C14–92–01158–CV.

Court of Appeals of Texas, Houston [14th Dist.].

Feb. 10, 1994.

Rehearing Overruled March 3, 1994.

---

Kenneth Wall, Houston, for appellants.

J. Randolph Burton, Houston, for appellee.

Before ROBERTSON and CANNON, JJ., and ROBERT E. MORSE, Jr., Former J. (Sitting by Designation).

## OPINION

### I. Nature of the Case

ROBERT E. MORSE, Jr., Former Justice.

This is an *ad valorem* property tax case. The Harris County Appraisal District (the "District") assessed a 1991 property tax against Virginia Indonesia Company ("VICO") on goods and equipment located in Harris County but destined for Indonesia. VICO protested to the Harris County Appraisal Review Board (the "Board"), and the Board upheld the tax. VICO sued the District and Board in district court, claiming that the tax violated the United States Constitution's commerce and import-export clauses and Texas property law. Both VICO and the District and Board moved for summary judgment. The district court granted VICO's motion and denied the District and Board's. The District and Board appeal. We reverse and remand.

### II. Facts

The following facts are undisputed. VICO is a Delaware corporation authorized to do business in Harris County, Texas. The District is a political subdivision of the state responsible for providing annual appraisal rolls listing taxable property and appraised values to taxing units within its jurisdiction that impose *ad valorem* property taxes. The Board is a separate entity responsible for, among other matters, hearing and determining taxpayer protests.

VICO is the operator of an Indonesian joint venture which explores for oil and gas in the Republic of Indonesia. VICO purchases goods and equipment for use by the joint venture in its Indonesian operations from vendors both within and outside Texas. Upon being notified that certain goods are needed in Indonesia, VICO issues a request for quotation to an Indonesian company that forwards the request to an agent who solicits bids. VICO selects a vendor and issues a purchase order for the goods. Generally, the vendor ships the goods directly to VICO's export packer in Houston and bills VICO.

At the export packer's yard in Houston, the goods are inspected for quality and correctness. If the goods are damaged or otherwise incorrect, VICO or its export packer resolves the irregularities with the vendor. VICO then requests from Indonesia approval for import. When import approval is granted, an international inspection agency inspects the goods on behalf of Indonesia. Local inspection enables the goods to avoid customs inspection upon their arrival in Indonesia. When a good or item of equipment has been finally cleared for import to Indonesia, VICO pays the vendor's invoice.

VICO's export packer then packs the goods for export. A separate freight forwarder, not associated with the export packer, arranges for shipment of the goods. The freight forwarder notifies the export packer when and where to deliver the goods for shipment. Most items are exported within 45 days from receipt by the packer, but in some cases they may remain with the packer for more than 90 days. VICO's property that was included on the District's 1991 appraisal roll consisted of the goods and equip-

ment physically present at the export packer's premises on January 1, 1991, although VICO has goods and equipment at that location throughout the year.

At no point in VICO's exporting process can the property be diverted to domestic use. All VICO purchase orders have FOREIGN PURCHASE ORDER printed at the top and "Ultimate destination for all items on this order is Indonesia." The property is committed for export to a foreign destination from the moment of purchase. The only reasons for holding the property at the export packer are for inspection, packing, and awaiting approval for import to Indonesia. None of the property is ever *used* in Texas.

### III. Discussion

In two points of error, the District and Board complain that the trial court erred in granting VICO's motion for summary judgment and denying their own.

### A. Standard of Review

The movant for summary judgment has the burden to show that there are no genuine issues of material fact and that he is entitled to judgment as a matter of law. *Nixon v. Mr. Property Management, Co.*, 690 S.W.2d 546, 548–49 (Tex.1985). In deciding whether there is a disputed material fact issue precluding summary judgment, we take evidence favorable to the non-movant as true. *Id.* We indulge every reasonable inference in favor of the non-movant and resolve any doubts in his favor. *Id.* If the movant's motion and summary judgment proof facially establishes his right to judgment as a matter of law, then the burden shifts to the non-movant to raise fact issues precluding summary judgment. *See City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex.1979). A defendant, to be entitled to summary judgment, is required to disprove at least one essential element of each pleaded cause of action or otherwise show that plaintiffs could not succeed on any theory pleaded. *Rosas v. Buddies Food Store*, 518 S.W.2d 534, 537 (Tex.1975).

In its motion for summary judgment, VICO contended that the goods and equipment destined for export were exempt from state taxation under the commerce and import-export clauses of the United States Constitution and under the Texas Constitution and Tax Code. U.S. Const. art. I, § 8, cl. 3 & § 10, cl. 2; Tex. Const. art. VIII, § 1–j; Tex.Tax Code Ann. §§ 11.01(c) and 11.251 (Vernon 1992 & Supp.1994). VICO further contended that the District waived its right to list the property on the 1991 appraisal roll by exempting similar VICO property in prior years. Finally VICO complained that the appraised value of its property was greater than its market value.

In its summary judgment order, the trial court held that VICO's property was not taxable because the property (1) was "protected from state taxation by exemptions provided by the Import–Export or Commerce Clauses of the United States Constitution," and (2) "fails to meet the [taxability] criteria as outlined under the Texas Tax Code." The trial court did not reach the waiver or appraised value issues. When the trial court specifies the grounds upon which it bases its summary judgment, we can only affirm the summary judgment on those grounds. *Carlisle v. Philip Morris Inc.*, 805 S.W.2d 498, 518 (Tex.App.—Austin 1991, writ denied). Therefore, we do not consider VICO's waiver argument as a basis for the summary judgment. However, we note that, generally, the doctrine of waiver does not preclude the taxation of property previously determined to be exempt. 16 Stephen M. Flanagan, The Law of Municipal Corporations § 44.84 (3rd ed. rev. 1984). Also, only in exceptional circumstances, is a governmental unit subject to estoppel, a doctrine related to waiver, in the exercise of its governmental powers. *City of Hutchins v. Prasifka*, 450 S.W.2d 829, 836 (Tex.1970). The Tax Code itself provides that the chief appraiser may cancel an exemption erroneously allowed. Tex. Tax Code Ann. § 11.43(h) (Vernon 1992).

To prevail in its summary judgment, VICO must have proved that the tax at issue was

(1) unconstitutional under the U.S. commerce clause, (2) unconstitutional under the U.S. import-export clause, or (3) invalid under Texas tax law.

## B. Commerce Clause

■ The foreign and domestic commerce clauses of the United States Constitution provide that "[t]he Congress shall have power ... to regulate commerce with foreign nations, and among the several states...." U.S. CONST. art. I, § 8, cl. 3. While on its face an affirmative grant of power to the Congress, the commerce clause has been interpreted to negative a state's power to unduly burden foreign or interstate commerce. It is this "negative" or "dormant" aspect of the commerce clause that is at issue in the present case.

■ Here, the *ad valorem* property tax is being imposed on goods and equipment destined for export to Indonesia. The foreign commerce clause is implicated, and a six-part test is used to determine whether the tax passes constitutional muster. *See Itel Containers Int'l Corp. v. Huddleston,* —— U.S. ——, ——, 113 S.Ct. 1095, 1103, 122 L.Ed.2d 421 (1993); *Nueces County v. Diamond Shamrock,* 853 S.W.2d 212, 217 (Tex.App.—Corpus Christi 1993, writ granted). The first four prongs of the foreign commerce clause test are the same as those used to determine compliance with the domestic commerce clause. A state tax is constitutional under the domestic commerce clause when the tax (1) is applied to an activity with a substantial nexus with the taxing state, (2) is fairly apportioned, (3) does not discriminate against interstate commerce, and (4) is fairly related to the services provided by the state. *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 279, 97 S.Ct. 1076, 1079, 51 L.Ed.2d 326 (1977). The last two prongs of the six-part test would validate a tax that (5) did not create a substantial risk of multiple international taxation, and (6) did not prevent the federal government from speaking with one voice when regulating commercial relations with foreign governments. *Japan Line, Ltd.*

*v. County of Los Angeles,* 441 U.S. 434, 451, 99 S.Ct. 1813, 1823, 60 L.Ed.2d 336 (1979).

The burden was on VICO to establish commerce clause immunity. *Container Corp. of Am. v. Franchise Tax Board,* 463 U.S. 159, 175–76, 103 S.Ct. 2933, 2945–46, 77 L.Ed.2d 545 (1983). To prevail in its summary judgment, VICO need only prove as a matter of law that the tax failed any one prong of the test. Conversely, for the District and Board to prevail on their summary judgment, they must prove as a matter of law that the tax met all six prongs.

Traditional commerce clause analysis focused on whether the goods taxed were "in transit" in interstate or foreign commerce. *See, e.g., Calvert v. Zanes–Ewalt Warehouse, Inc.,* 502 S.W.2d 689 (Tex.1973). However, the reformulation of the foreign commerce clause test, first announced in *Japan Line* and reaffirmed in *Huddleston,* abandons this mechanical "in transit" approach. Instead, the current test measures the constitutionality of a tax against the underlying purposes of the commerce clause. Once the purposes of the commerce clause are satisfied, "the concept of 'in transit' loses any rational meaning." *See Diamond Shamrock,* 853 S.W.2d at 216. It was "largely irrelevant" whether the goods and equipment in the export packer's warehouse were still considered "in the stream of interstate commerce" or whether they "came to rest" in Texas. *See D.H. Holmes Co. v. McNamara,* 486 U.S. 24, 31, 108 S.Ct. 1619, 1623, 100 L.Ed.2d 21 (1988). The issue of whether goods were merely "in-transit" through a state and therefore not taxable is now incorporated in the various prongs of the six-part analysis. The focus is no longer on a good's status as "import" or "export," but rather, on whether the purposes of the commerce clause are frustrated.

## Prong 1: Is the tax applied to an activity with a substantial nexus with the taxing state?

It was undisputed that VICO is a corporation doing business in Texas. VICO's business in Texas is the procurement of goods

and equipment for use by the Indonesian joint venture. VICO presumably derives profits through its procurement services. In essence, VICO uses Texas as a staging area for the goods it procures. Goods are shipped from in-state and out-of-state suppliers to Houston where the goods remain in an export packer's warehouse for an average of 45 days. During this time, (1) the goods and equipment are stored, (2) the goods are inspected for quality and conformity, (3) irregularities are resolved, (4) the goods are inspected for import clearance into Indonesia, (5) purchases are finalized, (6) the goods are packaged for export, and (7) shipping arrangements are made. The resolution of inspection discrepancies can involve the replacement of an item, a wait for missing parts, or the outright return of the item to the vendor. Goods and equipment are present in the packer's warehouse throughout the year.

We find that there was a sufficient nexus between VICO, the taxed goods and equipment, and Texas. VICO cannot rely on prong one to invalidate the *ad valorem* property tax.

## Prong 2: Is the tax fairly apportioned?

The goal is to avoid duplicative taxation. The tax here is assessed on the inventory of goods and equipment present in the export packer's warehouse on January 1, 1991. The tax is levied only on those goods, not the other goods and equipment that had occupied the warehouse at other times throughout the year. The average stay of a good or piece of equipment in Texas is 45 days. However, VICO is constantly shipping goods through the packer's warehouse, and goods similar to those present on January 1, 1991, are in the warehouse throughout the year. Therefore, basing the tax on the total value of goods present on any particular day is the equivalent of taxing the total value of all goods and equipment present at any time throughout the year at a rate proportionate to each item's time-of-stay in Texas, i.e., a ratio of 45 days/365 days. Therefore, Texas' *ad valorem* property tax, being roughly pro-rated as

to the property's duration of stay in Texas, is properly apportioned. *See Japan Line*, 441 U.S. at 445 n. 8, 99 S.Ct. at 1820 n. 8.

VICO argues that the tax cannot be properly apportioned because the export packer also pays property taxes. But the export packer pays a tax commensurate with *its* wealth, i.e., the warehouse facilities and equipment, but not commensurate with VICO's and the Indonesian joint venture's wealth, i.e., the *contents* of the warehouse. We find that VICO cannot rely on prong two to invalidate the tax.

## Prong 3: Does the tax not discriminate against interstate commerce?

A general *ad valorem* property tax does not tax goods based on origin or destination. Any incidental increase in cost to the supplier or ultimate consumer does not unduly burden interstate commerce. Interstate commerce should be made to pay its own way. *Complete Auto*, 430 U.S. at 279, 97 S.Ct. at 1079. We find that VICO cannot rely on prong three to invalidate the tax.

## Prong 4: Is the tax fairly related to the services provided by the State?

The *ad valorem* property tax is applied to property owners to compensate the state for a variety of services rendered, e.g., fire and police protection, port facilities, street lighting, roads and streets, and other incidents of a modern industrial infrastructure. While true that the goods and equipment are, from the time of purchase, destined for Indonesia, it is not unconstitutional for an exporter to pay his fair share of the cost of public services and infrastructure provided by the state. We find that the *ad valorem* property tax is fairly related to the services provided by the state. VICO cannot rely on prong four to invalidate the tax.

## Prong 5: Does the tax create a substantial risk of multiple international taxation?

VICO offered no evidence of a risk of multiple international taxation, and VICO's

reliance on *Japan Line* is misplaced. In *Japan Line,* the Court invalidated a California *ad valorem* property tax on cargo shipping containers owned by a Japanese-based company. But in *Japan Line,* there was evidence of multiple international taxation *in fact. Japan Line,* 441 U.S. at 452, 99 S.Ct. at 1823. Neither the foreign commerce clause nor *Japan Line* demands that a state's taxing power be restrained due to the mere *potential* taxation by a foreign sovereign. *Huddleston,* —— U.S. at ——, 113 S.Ct. at 1104. VICO cannot rely on prong five to invalidate the tax.

**Prong 6: Does the tax prevent the federal government from speaking with one voice when regulating commercial relations with foreign governments?**

VICO offered no evidence that the tax impacted on the federal government's ability to regulate foreign commerce. The *ad valorem* property tax does not discriminate against foreign commerce in general, nor against any particular foreign destination or state-of-origin. The tax does not single out a particular country for discriminatory tariffs thereby triggering retaliation against the United States as a whole. To the extent that the tax increases the cost of doing business through Harris County's port facilities, the market place and ultimate consumers can decide whether the benefits of using those facilities outweigh the costs. VICO cannot rely on prong six to invalidate the tax.

### Summary

We conclude that VICO did not establish as a matter of law that the tax assessed by the District runs afoul of the commerce clause. To the contrary, we find that the summary judgment proof and the undisputed facts conclusively establish that VICO cannot prevail on this ground. The trial court erred to the extent that it granted VICO's summary judgment on the basis that the *ad valorem* property tax violated the commerce clause.

### C. Import–Export Clause

■ The Import–Export Clause of the United States Constitution provides that

"[n]o state shall without the consent of congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws...." U.S. CONST. art. I, § 10, cl. 2.

In the past, import-export clause analysis focused on the status of a good as an "import" or "export." Various doctrines evolved to aid in this determination. For example, if an import stayed in its original package after arriving in the United States, it remained an "import" immune from state taxation. *Department of Revenue v. James B. Beam Distilling Co.,* 377 U.S. 341, 343, 84 S.Ct. 1247, 1248, 12 L.Ed.2d 362 (1964). Also, if an export had entered the "export stream" in its final continuous journey out of the country, then it was immune from state taxation. *Kosydar v. National Cash Register Co.,* 417 U.S. 62, 70–71, 94 S.Ct. 2108, 2113–14, 40 L.Ed.2d 660 (1974). But beginning with *Michelin Tire Corp. v. Wages,* 423 U.S. 276, 283, 96 S.Ct. 535, 539, 46 L.Ed.2d 495 (1976), the central inquiry shifted to a determination whether a particular tax constituted an impermissible "impost" or "duty." *See Department of Revenue v. Association of Washington Stevedoring Companies,* 435 U.S. 734, 752, 98 S.Ct. 1388, 1400, 55 L.Ed.2d 682 (1978).

We are aware that the *Michelin* Court's analysis was addressed to a tax on imports, not exports. However, in *Washington Stevedoring,* the Court held that the *Michelin* approach applies to exports as well as imports. *Id.* at 758, 98 S.Ct. at 1403. We are also aware that *Michelin* did not deal with the issue of a tax on goods "in transit" in foreign commerce and that the Court in *Washington Stevedoring* held: "We do not reach the question of the applicability of the *Michelin* approach when a State directly taxes imports or exports in transit." *Id.* at 757 n. 23, 98 S.Ct. at 1403 n. 23; *see also City of Farmers Branch v. Matsushita Elec. Corp. of Am.,* 537 S.W.2d 452, 453 (Tex.1976), *cert. denied,* 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1986). However, we read *Huddleston* as putting to rest the issue of the relevancy of "in transit" status as affecting the applicability of the *Michelin* approach:

[W]e reject the argument that the tax violates the prohibition on the direct taxation

of imports and exports "in transit," the rule we followed in *Richfield Oil [Corp. v. State Bd. of Equalization]*, 329 U.S. [69], at 78–79, 84, 67 S.Ct. [156], at 161, 164 [91 L.Ed. 80 (1946)]. *Even assuming that rule has not been altered by the approach we adopted in Michelin*, it is inapplicable here.

*Huddleston*, —— U.S. at ——, 113 S.Ct. at 1106 (emphasis added).

*See also Diamond Shamrock*, 853 S.W.2d at 216 ("We conclude that once the purposes of the Import–Export Clauses ... have been satisfied ... the concept of 'in transit' loses any rational meaning.")

■ The current import-export clause test is based on the main concerns prompting the framers of the Constitution to adopt the import-export clause. The test has three elements: (1) Does the challenged tax impair the federal government from speaking with one voice when regulating commercial relations with foreign governments?, (2) Does the tax threaten to disturb harmony among the states by allowing seaboard states, with their crucial ports of entry, to levy taxes on citizens of other states by taxing goods *merely flowing through* their ports?, or (3) Does the tax divert import-derived revenue from the federal government to the states?. *Huddleston*, —— U.S. at ——, 113 S.Ct. at 1105 (emphasis added).

To prevail in its summary judgment, VICO need only prove as a matter of law that the tax failed any one prong of the test. Conversely, for the District and Board to prevail on their summary judgment, they must prove as a matter of law that the tax met all three prongs.

**Prong 1: Does the *ad valorem* property tax impair the federal government from speaking with one voice when regulating commercial relations with foreign governments?**

**Prong 2: Does the tax threaten to disturb harmony among the states by allowing Texas, with its excellent port facility in Houston, to levy taxes on citizens of other states by taxing goods *merely flowing through* its port?**

The one-voice component of the import-export clause test is the same as the one-voice component of the foreign commerce clause test. *Id.* Likewise, the state-harmony component parallels the four *Complete Auto* requirements of the foreign and domestic commerce clause tests. *Id.* at ——, 113 S.Ct. at 1105–06. Having concluded that Texas' *ad valorem* tax survives commerce clause scrutiny, we must conclude that the tax passes the first two prongs of the import-export clause test. *See id.* at ——, 113 S.Ct. at 1106. We find that VICO cannot rely on prongs one or two to invalidate the tax.

**Prong 3: Does the tax divert import-derived revenue from the federal government to Texas?**

An *ad valorem* property tax on goods and equipment destined for *export* does not implicate *import* revenues. Nor are federal export revenues affected since the Constitution expressly prohibits Congress from taxing exports. U.S. CONST. art. I, § 9, cl. 5. VICO cannot rely on prong three of the current import-export clause test to invalidate the tax.

**Summary**

We conclude the VICO did not prove as a matter of law that Texas' *ad valorem* property tax is unconstitutional under the import-export clause. To the contrary, we find that the summary judgment proof and the undisputed facts conclusively establish that VICO cannot prevail on this ground. The trial court erred to the extent that it granted VICO's summary judgment on the basis that the *ad valorem* property tax violated the import-export clause.

Having determined that an *ad valorem* tax on VICO's property would not violate U.S. commerce or import-export clauses, we must next determine whether the tax comports with Texas law.

**D. Texas Property Tax Law**

Section 11.01(c) of the Texas Tax Code provides that "This state has jurisdiction to tax tangible personal property if the proper-

ty is ... located in this state for longer than a temporary period...." TEX.TAX CODE ANN. § 11.01(c)(1) (Vernon 1992). In its motion for summary judgment, VICO contended that Texas had no jurisdiction to tax its property because VICO's goods were not located in Texas "for longer than a temporary period." VICO further argued that, even if its goods and equipment were in Texas "for longer than a temporary period," they were entitled to the freeport goods exemption. *See* TEX.TAX CODE ANN. § 11.251 (Vernon 1992 & Supp.1994) and TEX. CONST. art. VIII, § 1–j.

## Background

"For longer than a temporary period" is not defined in the Tax Code. Under prior law, the Texas legislature had established criteria for a presumption that goods were *not* located in Texas "for longer than a temporary period:"

> Goods, wares, ores, ... and merchandise are presumed to be in interstate commerce and/or are *not to be located in this state for longer than a temporary period* if the property is: (1) transported from outside this state into the state to be forwarded outside this state; (2) detained in this state for assembling, storing, manufacturing, processing, or fabricating purposes; and (3) not located in this state for longer than 175 days.

*Dallas County Appraisal Dist. v. Brinkman,* 701 S.W.2d 20, 21–22 (Tex.App.—Dallas 1985, writ ref'd n.r.e.), quoting TEX.TAX CODE ANN. § 11.01(d) (Vernon 1982) (the freeport law) (emphasis added) (repealed by Acts 1989, 71st Leg., ch. 534, § 2, eff. Jan. 1, 1990) (*see now* § 11.251).

But the Texas Constitution requires that "*[a]ll* real property and tangible personal property in this State, unless exempt as required or permitted *by this Constitution,* ... shall be taxed in proportion to its value...." TEX. CONST. art. VIII, § 1 (emphasis added); *Brinkman,* 701 S.W.2d at 22. In *Brinkman,* the court was concerned that the freeport law authorized a tax exemption unsupported

by the Texas Constitution. The court therefore held that the freeport presumption was rebuttable by a showing that the goods at issue were indeed "located in the State for longer than a temporary period:"

> We conclude that goods are located in the state for longer than a temporary period if, under federal law, they are in the state on more than a transitory basis.... Goods are in the state on a transitory basis if they are in "interstate transit".... Goods are *not* in interstate transit if there is an interruption in the continuity of transit.... If the owner halts the transit, "not in necessary delay or accommodation to the means of transportation ... but for the business purposes and profits of the company," ... then there is an interruption in the continuity of transit and the goods are taxable in the state.

*Brinkman,* 701 S.W.2d at 23 (citations omitted) (emphasis in original); *see also Friedrich Air Conditioning and Refrigeration Co. v. Bexar Appraisal Dist.,* 762 S.W.2d 763, 767–68 (Tex.App.—San Antonio 1988, no writ).

In both *Brinkman* and *Friedrich Air,* the courts held that the freeport presumption was rebutted and that the goods at issue were taxable. However, in 1989, the legislature repealed the freeport law and enacted in its stead § 11.251, which established the freeport goods exemption. Section 11.251 provides in pertinent part:

> (a) In this section, "freeport goods" means property that under Article VIII, Section 1–j, of the Texas Constitution is not taxable.
>
> (b) A person is entitled to an exemption from taxation of the appraised value of that portion of the person's inventory or property consisting of freeport goods.
>
> \*　\*　\*　\*　\*　\*
>
> (i) The exemption provided by Subsection (b) does not apply to a taxing unit that takes action to tax the property under Article VIII, Section 1–j, Subsection (b), of the Texas Constitution.
>
> \*　\*　\*　\*　\*　\*

TEX.TAX CODE ANN. § 11.251 (Vernon 1992).

Significantly, the Texas Constitution was also amended to provide a constitutional un-

derpinning for the statutory freeport goods exemption. Section 1–j of the Texas Constitution provides:

(a) To promote economic development in the State, goods, wares, merchandise, other tangible personal property, and ores . . . are exempt from ad valorem taxation if:

(1) the property is acquired in or imported into this State to be forwarded outside this State, whether or not the intention to forward the property outside this State is formed or the destination to which the property is forwarded is specified when the property is acquired in or imported into this State;

(2) the property is detained in this State for assembling, storing, manufacturing, processing, or fabricating purposes by the person who acquired or imported the property; and

(3) the property is transported outside this State not later than 175 days after the date the person acquired or imported the property in this State.

(b) Tangible personal property exempted from taxation in Subsection (a) of this section is subject to the following:

(1) A county, common, or independent school district, junior college district, or municipality, including a home-rule city, may tax such property otherwise exempt, if the governing body of the county, common, or independent school district, junior college district, or municipality, including a home-rule city, *takes official action* as provided by this section and in the manner provided by law to provide for the taxation of such property.

(2) Any official action to tax such exempt property must be taken before April 1, 1990. If official action is taken to tax such exempt property before January 1, 1990, such property is taxable effective for the tax year 1990. However, if such official action to tax such exempt property is taken prior to April 1, 1990, but after January 1, 1990, the official action shall not become effective to tax such property until the 1991 tax year.

\* \* \* \* \* \*

(4) The governing body of a county, common, or independent school district, junior college district, or municipality, including a home-rule city, that acts under Subdivision (2) of Subsection (b) of this section to tax the property otherwise exempt by Subsection (a) of this section may subsequently exempt the property from taxation by rescinding its action to tax the property. The exemption applies to each tax year that begins after the date the action is taken and applies to the tax year in which the action is taken if the governing body so provides. A governing body that rescinds its action to tax the property may not take action to tax such property after the recission.

\* \* \* \* \* \*

TEX. CONST. art. VIII, § 1–j.

Under the *prior* law, then, the Texas legislature had sought to clarify the meaning of "located in this state for longer than a temporary period" by establishing the freeport law presumption, which Texas courts held to be subject to rebuttal by application of federal constitutional principles. However, as discussed earlier, in determining the constitutionality of a state tax, current federal commerce and import-export clause jurisprudence no longer focuses on whether goods are "in interstate transit," committed to the "export stream," or have retained their "status" as "imports" or "exports." We have found that current federal constitutional law does not preclude Texas' non-discriminatory *ad valorem* property tax.

Under *current* Texas law, the legislature has replaced the freeport law's rebuttable presumption with the freeport goods exemption, which has been expressly validated by amendment of the Texas Constitution. Therefore, under present Texas tax law, the critical inquiries in judging the validity of the 1991 property tax on VICO's goods, are (1) whether any eligible taxing entities "took official action to tax" freeport goods prior to April 1, 1990, thereby preempting the exemption, *see* TEX. CONST. art. VIII, § 1–j(b)(1) &

(2), (2) whether VICO's goods met the free-port goods criteria, *see id.* § 1–j(a), and (3) whether VICO applied for the exemption, *see* Tex.Tax Code Ann. § 11.43 (Vernon 1992 & Supp.1994).

### Did the Taxing Entities "Take Action to Tax" Freeport Goods?

The notice of appraised value issued to VICO listed nine taxing entities: the Aldine Independent School District, Harris County Education District, Harris County, Harris County Flood Control District, Port of Houston Authority, Harris County Hospital District, Harris County Department of Education, North Harris/Montgomery Community College District, and the City of Houston. The record does not show (1) which of these taxing entities are political subdivisions authorized to preempt the freeport goods exemption, *see* Tex. Const. art. VIII, § 1–j(b)(1), (2) which of the eligible political subdivisions did, in fact, preempt the freeport goods exemption by taking official action to tax such property prior to April 1, 1990, *see id.* § 1–j(b)(2), and (3) which of the latter political subdivisions rescinded their action to tax, *see id.* § 1–j(b)(4). If an eligible taxing entity did not exercise its option and take official action to tax such property, then the exemption would be available as to that entity when properly applied for by the taxpayer. On the other hand, if an eligible taxing entity did take such official action to tax freeport goods, then the exemption would not be available as to that entity.

■ Section 1–j(a) states that goods *"are exempt* from ad valorem taxation" if the freeport goods criteria are met. *Id.* § 1–j(a) (emphasis added). Section 1–j(b) states that "property exempted from taxation in Subsection (a) of this section is *subject to"* the provisions relating to the option of certain taxing entities to preempt the exemption. *Id.* § 1–j(b) (emphasis added). We interpret this language to mean that a taxpayer's showing that his goods complied with the freeport goods criteria raises a presumption that the goods are exempt. That presump-

tion is rebuttable as to an eligible taxing entity by a showing that such entity took official action to tax the property prior to April 1, 1990, and did not subsequently rescind its action.

With respect to VICO's motion for summary judgment, as discussed below, VICO did not establish as a matter of law that any of its 1990 or 1991 goods met the freeport goods criteria. Therefore, the presumption of a non-preempted exemption did not arise. Had VICO established that its goods were freeport goods, then the presumption of a valid exemption would have arisen, and the burden would have shifted to the District and Board to rebut the presumption.

On the other hand, regarding the District and Board's motion for summary judgment, the District and Board provided no evidence that any taxing entity had preempted the freeport goods exemption. Therefore, the District and Board's motion fails to the extent that the District and Board relied on the taxing entities having preempted VICO's freeport goods exemption. We note that the District's 1991 Rendition Form, with its express provision for taxpayers to invoke the freeport goods exemption, suggests that at least one of the taxing entities allows the exemption, i.e., that at least one taxing entity did not take official action to preempt the exemption.

### Were VICO's Goods "Freeport Goods?"

■ We find that the summary judgment proof shows that VICO's property met the first two elements of the freeport goods criteria. That is, the property was (1) acquired in or imported into Texas to be forwarded outside Texas, and (2) detained in Texas for storing and processing. *See* Tex. Const. § 1–j(a)(1) & (2). However, we find that a fact issue exists regarding which items of property were transported outside Texas no later than 175 days after the date VICO acquired or imported the property into Texas. *Id.* § 1–j(a)(3). VICO's summary judgment proof merely identifies several items that had been in Texas more than 175 days

*as of January 1, 1991.* The proof does not establish whether the remaining items of property were, in fact, shipped out of Texas within 175 days of their acquisition or importation into Texas.

Moreover, we find that a fact issue exists as to which items of VICO's property owned *in the preceding year* met the freeport goods criteria. This is important because of the appraisal procedures specified by § 11.251:

> (d) ... The chief appraiser shall determine the percentage of the market value of inventory or property owned by the property owner *in the preceding calendar year* that was contributed by freeport goods. The chief appraiser shall apply that percentage to the market value of the property owner's inventory or property *for the current year* to determine the appraised value of freeport goods *for the current year.*

> \*     \*     \*     \*     \*     \*

> (g) If the property owner or the chief appraiser demonstrates that the method provided by Subsection (d) significantly understates or overstates the market value of the property qualified for an exemption under Subsection (b) in the current year, the chief appraiser shall determine the market value of the freeport goods to be exempt by determining according to the property owner's records and any other available information, the market value of those freeport goods owned by the property owner on January 1 of the current year....

> \*     \*     \*     \*     \*     \*

TEX.TAX CODE ANN. § 11.251(d) & (g) (Vernon 1992) (emphasis added).

We are unable to extract from the summary judgment proof the information needed to apply § 11.251. In any event, this is a matter best left to the trial court and the parties with the necessary records and expertise to properly implement the technical aspects of the appraisal process. We therefore find that fact issues exist precluding summary judgment in favor of either VICO or the District and Board.

### Did VICO Apply for the Freeport Exemption?

■ We next ask whether VICO applied for its freeport goods exemption. Section 11.43 of the Tax Code provides:

> (a) To receive an exemption, a person claiming the exemption "... *must apply* for the exemption. To apply for an exemption, a person *must file an exemption application form* with the chief appraiser...."

> (b) ... [A] person required to apply for an exemption *must apply each year* the person claims entitlement to the exemption.

> \*     \*     \*     \*     \*     \*

> (d) A person required to claim an exemption must file a completed exemption application form *before May 1* and must furnish the information required by the form....

> (e) ... [I]f a person required to apply for an exemption in a given year *fails to file* timely a completed application form, the person *may not receive the exemption* for that year.

> \*     \*     \*     \*     \*     \*

TEX.TAX CODE ANN. § 11.43 (Vernon 1992) (emphasis added).

The summary judgment proof included VICO's 1991 Rendition of Business Personal Property. In the section of the form captioned "Inventory of Merchandise, Finished Goods, or Consigned Goods" VICO typed the following note:

> Note: This inventory is exempt from sales and use tax and *we hereby apply for property tax exemption.* All is being exported. You have exempt in past. (Emphasis added.)

However, in the section of the rendition above this note were the following pre-printed instructions:

> If you claim entitlement to the "freeport exemption" provided by Sec. 11.251 Texas

Tax Code, check this box. Report full original cost of all inventory on this rendition and attach a completed exemption application using form 11.251 prescribed by the State Property Tax Board.

The box preceding these instructions was not checked. Nor is there anything in the record to show that VICO completed an "exemption application form" *per se.*

The legislative intent of the free-port goods exemption, as stated expressly within § 1–j itself, is "[t]o promote the economic development in the State." TEX. CONST. art. VIII, § 1–j. With this intent foremost in mind, we find that VICO's failure to complete a § 11.251 exemption form for 1991 is not fatal to its claim for property tax immunity.

VICO applied for the exemption in the same manner that it had in the prior tax years of 1989 and 1990 by annotating its annual rendition form and supplying supplemental justification. VICO's application in those years was apparently adequate for the District to exempt VICO's property in those years. In 1991, VICO provided a complete listing of inventory as of January 1 and supplemented its rendition with a letter detailing the nature of its exporting operation. All this was done prior to the May 1 deadline for claiming an exemption. There is no indication in the record that VICO intentionally withheld information or failed to respond to any District request for records.

We take judicial notice of the Texas Register and its description of the required contents of the § 11.251 exemption form: (1) the owner's name, street address, mailing address, and telephone number; (2) a description of the inventory affected by the exemption; (3) the total cost of goods sold from inventory held by the property owner in the preceding year; (4) the total cost of goods sold from inventory that in the preceding year met the criteria set forth in the Tax Code, Texas Constitution, Article VIII, § 1–j(a)(1), (3), excluding the cost of equipment, machinery, or materials that entered into and became part of the inventory described in paragraph three of this subsection but did

not themselves meet the criteria set forth in the Texas Constitution; (5) a statement that the property owner holds items in inventory that in the current year meet or will meet the requirements of the Texas Constitution; and (6) a statement indicating how long the property owner has engaged in the business of transporting goods out of this state. 17 Tex.Reg. 1159 (1992) (codified at 34 TEX.AD-MIN.CODE § 9.404) (Comptroller of Public Accounts).

The tax law had recently been changed and new information requirements and forms introduced. Our opinion should not be read as condoning a taxpayer's failure to provide information to the taxing authority in a format necessary for maximum administrative efficiency. However, on the unique facts of this case, we find that VICO did make a *bona fide* effort to apply for its property tax exemption and provided most of the required information to the District. We believe that the purpose of the freeport goods exemption, to promote economic development, would not be served by our holding that VICO's tax exemption turned on whether VICO checked a particular box or completed a particular form. Therefore, we find that VICO established that it applied for the freeport exemption. What supplemental information the trial court and District may require to calculate VICO's 1991 tax liability can be gathered on remand.

### Appraisal Value

The trial court granted VICO's summary judgment on tax liability and did not reach VICO's contention that the appraised value of the goods and equipment was overstated. VICO argued that the District's appraisal was based on a computational error resulting in an appraised value of $380,260.00 rather than the correct value of $296,846.95.

We have found that VICO, in principle, is entitled to a freeport goods exemption. On remand, VICO's tax liability, if any, will be determined under § 11.251. In the event that an over-appraisal question arises on remand, we note that the tax code provides for the correction of computational errors.

VICO was entitled to protest to the Board the "determination of the appraised value" of its property, TEX.TAX CODE ANN. § 41.41(1) (Vernon 1992), within the timeline specified in § 41.44. Additionally, VICO was entitled to move the Board to "direct by written order changes in the appraisal roll to correct ... clerical errors that affect [VICO's] liability ...." TEX.TAX CODE ANN. § 25.25 (Vernon 1992). Still further, "At any time, the governing body of a taxing unit, on motion of the assessor for the unity or of a property owner, shall direct by written order changes in the tax roll to correct errors in the mathematical computation of a tax." TEX.TAX CODE ANN. § 26.15 (Vernon 1992); see Liland v. Dallas County Appraisal Dist., 731 S.W.2d 109, 112 (Tex.App.—Dallas 1987, no writ). Section 26.15(c) does not appear to set a time limit on the correction of mathematical computation of a tax. See § 26.15(c). And under § 25.25, the Board may correct clerical errors in the appraisal roll at any time before the end of five years after January 1 of a tax year. See § 25.25(c).

"In order for a taxpayer to protest an action taken by a taxing authority, the taxpayer must follow the procedures outlined by the Tax Code. These requirements are jurisdictional." Harris County Appraisal Dist. v. Texas Nat'l Bank, 775 S.W.2d 66, 69 (Tex. App.—Houston [1st Dist.] 1989, no writ). The remedies defined in the Tax Code are exclusive, and failure to exhaust the available administrative remedies precludes a taxpayer from seeking judicial review. See id. at 70; TEX.TAX CODE ANN. § 42.09 (Vernon 1992).

Therefore, if in the trial court VICO seeks to correct the computational error, it would need to demonstrate that it had exhausted its administrative remedies.

### Summary

Although an ad valorem property tax on VICO's goods does not run afoul of the U.S. commerce or import-export clauses, Texas has exempted freeport goods to promote the economic development of the state. While VICO made a bona fide effort to apply for the exemption, fact issues remain precluding summary judgment. On remand, to determine VICO's tax liability, the trial court will first need to ascertain which taxing entities allow the exemption, then, if necessary, VICO's 1990 or 1991 freeport goods activity history.

### IV. Conclusion

We conclude that an ad valorem property tax on VICO's goods and equipment does not violate the U.S. Constitution's commerce or import-export clauses. However, we also conclude that VICO, in principle, was entitled to the freeport goods exemption under Texas law and that VICO substantially complied with application requirements. However, fact issues remain as to the actual amount of VICO's exemption and tax liability. This will depend on what information the District and Board provide regarding taxing entities' official actions to preempt the freeport goods exemption. Assuming an exemption exists, the amount of VICO's tax liability will turn on what information VICO provides, in compliance with § 11.251(d), as to previous-year freeport goods activity history. Alternatively, should § 11.251(g) be invoked by either party, VICO's tax liability will depend on VICO's 1991 freeport goods activity.

We therefore find that the trial court erred in granting VICO's summary judgment. Fact issues exist precluding summary judgment for either party. We sustain the District and Board's point of error one and remand the cause to the trial court to calculate the amount of VICO's tax liability, if any. Since the trial court did not err in denying the District and Board's motion for summary judgment, we overrule point two.